**LILLEY–AMES COMPANY, Inc.**

v.

**UNITED STATES.**

No. 214–58.

United States Court of Claims.
July 19, 1961.

Edwin J. McDermott, Philadelphia, for plaintiff.

Sheldon J. Wolfe, Washington, D. C., with whom was William H. Orrick, Jr., Asst. Atty. Gen., for defendant.

JONES, Chief Judge.

This is a contract action. The plaintiff contracted to produce and deliver barrack bags for the defendant. The plaintiff alleges that the defendant furnished it with defective material whereby the plaintiff sustained costs in excess of its bid price. The plaintiff brings this suit to recover that alleged excess.

The facts of this case are as follows. On April 6, 1953, the Armed Services Textile and Apparel Procurement Agency, Departments of the Army, Navy, and Air Force, issued an invitation for bids for the manufacture and delivery of olive drab denim barrack bags to certain designated sites between August and November 1953. The barrack bags were to be manufactured from Government-furnished olive drab denim.

Pursuant to the provisions of the invitation to bid, plaintiff secured a sample barrack bag from the Quartermaster Corps. Plaintiff studied the sample bag with regard to the nature of the sample bag's material and construction. Plaintiff made a pattern conforming to the sample and to the plaintiff's understand-

ing of the specifications. As the plaintiff read the specifications, they provided for Government-furnished cloth containing a maximum of 1½ percent sizing.[1] Sizing is an additive chemical which is put into the material before it is woven to prepare the warp yarns for the weaving process. The trial commissioner has found that sizing, which is commonly referred to as starch, gives cohesiveness to the fibers and tends to stiffen a fabric. Desizing, on the other hand, is a process for starch removal. Ordinarly such removal is done preparatory to bleaching or dyeing the material.[2]

After studying the sample cloth, the plaintiff found the sample material similar to that which it believed the Government was going to furnish. At about the time plaintiff received this invitation to bid, the plaintiff had been making utility caps for the Marine Corps out of a herringbone twill furnished by defendant. Plaintiff used some excess yardage of the leftover herringbone twill and made several bags from it. On the basis of the production of these bags, plaintiff prepared its unit labor costs. On May 26, 1953, plaintiff was awarded the contract for the production and delivery of 216,600 barrack bags at a total price of $77,127.30.[3]

When the Government-furnished olive drab denim was received by plaintiff, the plaintiff was surprised to discover that the material was stiffer and heavier than both the cloth in the Government sample and the cloth in the herringbone twill out of which plaintiff made the bags upon which it based its unit labor costs. The denim furnished to the plaintiff contained approximately 10 percent nonfibrous materials of which about 7 percent was sizing.[4] As we have seen, however, the plaintiff was operating on the assumption that the Government-furnished material would contain a maximum of 1½ percent sizing.

The trial commissioner in his findings has pointed out that a shop, such as the plaintiff's, set up to process only the softer, more flexible material would have great difficulty in using denim containing a high degree of sizing. The evidence in this case clearly bears out the truth of this observation. Plaintiff's sewing machines were unable to process the stiff material. As a consequence, the machines broke down. Plaintiff's operators could not get the material through the machine folder. The needles on the needle machines were alternately misshapen, burned, and broken. These difficulties and many others all flowed from the fact that the Government-furnished material contained more sizing than was anticipated.[5]

Plaintiff sent successive letters to the contracting officer protesting the nature of the Government-furnished material. The contracting officer denied the plaintiff's claim. He reasoned that Federal Specification CCC-D-186 [6] permitted the denim to contain a maximum of 13 percent sizing, finishing, and other nonfibrous materials. The contracting officer concluded that since the Government-furnished material contained only 7 percent sizing, the material was not defective.

On appeal, the Armed Services Board of Contract Appeals on August 14, 1956, decided that plaintiff was entitled to an equitable adjustment since the Board concluded that the Government-furnished material was not fully in accord with the specifications. The Board interpreted specification JAN-D-504 [7] to apply. That specification required that the Government-furnished denim should not ex-

---

1. Finding 2(d).

2. Finding 10(a) and (b).

3. Finding 5.

4. Finding 10(c).

5. Findings 6 and 7.

6. Finding 2(c).

7. Finding 2(d).

ceed 1½ percent sizing content. The Board concluded that the basic specification, MIL–B–2378a[A],[8] required that the Government-furnished denim be de-sized so as to produce a fabric with satisfactory sewing qualities. The Board remanded the case to the contracting officer for a determination as to the amount plaintiff should recover. On January 14, 1957, the contracting officer decided that plaintiff was entitled to an equitable adjustment of $4,700.44. Upon appeal, on December 30, 1957, the Army Contract Appeals Panel decided that the amount of the equitable adjustment should be $12,996.60. This amount has been paid to plaintiff.

█ The principal issue in this case is a simple one. Did the Government-furnished material contain more sizing than that provided for by the specifications? Defendant vigorously relies on Federal Specification CCC–D–186 which says that the cloth shall not contain more than 13 percent for class C of finishing nonfibrous materials. Plaintiff for its part relies on Military Specification, JAN–D–504,[9] referenced in the basic specification, which provides that dyed fabric shall not contain more than 1½ percent sizing. We reject defendant's theory that CCC–D–186 [10] entitled it to furnish the plaintiff with material containing 7 percent sizing. The words "sizing" and "nonfibrous material" are not interchangeable terms. Nonfibrous material includes sizing but is not identical with it. CCC–D–186 permits 13 percent nonfibrous material; it does not refer to sizing. According to the plaintiff's understanding, the specification that spelled out the amount of sizing permissible in the Government-furnished material was JAN–D–504 which stated that the sizing would not be in excess of 1½ percent. Plaintiff found the material in the sample bag consistent with this interpretation. The herringbone twill which it used to make the bags on which

it based its unit labor costs for this contract likewise conformed to this interpretation of the specification. It is elemental contract law that where the contract specifications are ambiguous, the ambiguity should be construed against their author. Wunderlich Contracting Co. v. United States, 143 Ct.Cl. 876, 878. We think that as a matter of law the Government-furnished material was not fully in accord with the specifications. We note that this was the Board's conclusion as well.[11]

Plaintiff says that the Board's decision is arbitrary and capricious and not supported by substantial evidence because the sum allowed is not sufficient. Defendant also attacks the Board's decision and alleges that the Board has been arbitrary and capricious because as a matter of law the specifications permitted the defendant to furnish denim containing 7 percent sizing. As we have said above, we cannot accept the defendant's theory that its material conformed to specifications as a matter of law. Consequently, we find no merit in defendant's counterclaim.

█ The plaintiff contends that it is entitled to additional damages beyond those allowed by the Board. The plaintiff's theory in this regard generally appears to be that it should be recompensed for the total loss it experienced under this contract. For example, plaintiff actually sustained a total increase in labor costs of 60 percent. But only a portion of this increase can be ascribed to the fact that the defendant supplied the plaintiff with material of a high rather than a low degree of sizing. The plaintiff of course can recover only for those expenses occasioned from the furnishing of highly-sized denim by the defendant. The plaintiff may not include all costs arising from the performance of the contract as the basis for its recovery. The defendant is under no obligation of "reimbursing it [plaintiff] for whatever

8. Finding 2(b).

9. Finding 2(d).

10. Finding 2(c).

11. Finding 20.

losses it incurred, notwithstanding their nature." Christensen Construction Co. v. United States, 72 Ct.Cl. 500, 514. See also Chain Belt Company, a Wisconsin Corporation v. United States, 115 F. Supp. 701, 127 Ct.Cl. 38, 58. Both the decision of the Armed Services Board of Contract Appeals and the independent findings of our trial commissioner show that only a 35 percent increase in labor costs is attributable to the furnishing of substantially sized denim.[12]

The Board allowed the plaintiff 22.8 percent of the amount reached by using this 35 percent figure for increased overhead. The 22.8 percentage was obtained from plaintiff's bid estimate. The Board apparently applied this percentage because no evidence had been adduced before it indicating what plaintiff's actual overhead costs were. From the evidence taken before this court, however, we have found that plaintiff's actual overhead costs were not 22.8 percent of its direct labor costs, but 61.77 percent.[13]

We think that in measuring plaintiff's loss arising from the highly sized denim, we should use the actual percentage of overhead experienced by plaintiff rather than plaintiff's hypothetical bid estimate. In Great Lakes Dredge & Dock Co. v. United States, 96 F.Supp. 923, 119 Ct.Cl. 504, 558, this court was presented with the choice of applying a hypothetical estimate or a proven actual cost figure in measuring damages. We said in that case at page 925 of 96 F. Supp., at page 558 of 119 Ct.Cl.:

"In a case such as this, where the contracting officer approved plaintiff's method of operation, and where we have found that the plaintiff's actual increased costs were necessary and reasonable, *we think the contract contemplated that those actual costs, and not the costs of some hypothetical alternative solu-*tion *of the problem, should be the basis of the equitable adjustment.*" [Emphasis supplied.]

Application of the actual percentage of 66.77 for overhead rather than the bid estimate percentage of 22.8 percent requires us, of course, to make a slight adjustment in plaintiff's total profit allowance.[14] We find that these adjustments entitle the plaintiff to $17,233.13,[15] instead of the amount of $12,996.60 which the Board did allow, a difference of $4,236.53, a result which we are confident the Board would have reached had it been presented with the same factual evidence.

Judgment will be entered for the plaintiff in the amount of $4,236.53. Defendant's counterclaim will be dismissed.

It is so ordered.

DURFEE, LARAMORE, MADDEN, and WHITAKER, Judges, concur.

### Findings of Fact

The court, having considered the evidence, the briefs and argument of counsel, and the report of Trial Commissioner Saul R. Gamer, makes the following findings of fact:

1. Prior to 1949 and going back to 1864, the Lilley-Ames Company (under various but similar names) had been an Ohio corporation engaged in the manufacture of garments, specializing in the lodge regalia type of business. Its principal place of business was in Columbus, Ohio. During World War II, it had a number of Government contracts in addition to its regular business but thereafter, and about 1949, it encountered financial difficulties. Subsequently, one William H. Kay became interested in purchasing the assets of the company and those in control of the company agreed to sell such assets to him. To

12. Finding 25(a).

13. Finding 25(b).

14. Finding 25(c).

15. For the breakdown of the various damage items comprising this total, see finding 25(b), (c), and (d).

effect the transfer of assets, and to retain the name of the company, the actual transfer was accomplished by having the assets transferred to another corporation owned and controlled by Kay, known as the U. S. Chromite Company. On August 26, 1950, the name of U. S. Chromite Company was changed to The Lilley-Ames Company, Inc. In 1952, Kay owned or controlled several other corporations, one of which was The Bill Kay Oldsmobile Company, a corporation organized and existing under the laws of Ohio, with its principal place of business in Columbus, Ohio. On November 21, 1952, an Agreement of Consolidation was effected under which The Lilley-Ames Company, Inc. and The Bill Kay Oldsmobile Company consolidated into a new corporation with the name of Bill Kay Oldsmobile Company, the name of said company being further changed on August 23, 1955, to Bill Kay, Inc. After the consolidation the former Lilley-Ames Company, Inc. was operated as a Division of Bill Kay Oldsmobile Company and Bill Kay, Inc., respectively, under the name of "The Lilley-Ames Company Division of Bill Kay, Inc." which is the style under which the amended petition herein is captioned.

2. (a) On April 6, 1953, the Armed Services Textile and Apparel Procurement Agency, Departments of the Army, Navy and Air Force, issued an Invitation For Bids (designated as "Invitation No. TAP–30–352–53–503") for the furnishing, by "small business concerns only" of OD [olive drab] barrack bags, deliveries to be made in various amounts to certain designated destinations during each month of August, September, October, and November 1953. Bids were made "subject to the Terms and Conditions of this Invitation For Bids and the attached Schedule and General Provisions." The Invitation provided that the bags should conform to the requirements of "Military Specification MIL–B–2378a [A] dated 26 January 1951 with exceptions stated herein", and were to be manufactured out of material to be furnished by the Government

The "Terms and Conditions of the Invitation for Bids", hereinabove mentioned, provided in part as follows:

"10. *Bids.*—

\* \* \* \* \* \*

"(d) Mistake. Bidders are expected to examine the drawings, specifications, circulars, Schedule, and all instructions pertaining to the supplies or services. Failure to do so will be at the bidder's risk. \* \* "

The attached "Schedule" hereinabove mentioned provided in pertinent part as follows:

"Exceptions to the Specification MIL—B—2378A:

"Para. 2.1— Delete the title of CCC–T–191 and substitute 'Textile Test Methods'

\* \* \* \* \*

"Para. 3.2.1.1— Delete water repellent and mildew resistant treated.

\* \* \* \* \*

"Para. 3.2.2.2— Delete and substitute '3.2.2.2—Treatment mildew *resistant* — The thread shall be treated for mildew resistance in accordance with Class 1 of Specification MIL–T–3530A.'

"Para. 3.2.3— Rope, cotton, solid braided, No. 6—Add the following: 'except that the mildew resistant treatment will be in accordance with MIL–T–16070, Type I.'

\* \* \* \* \*

"Reference Specifications:

"*Federal Specifications:*

\* \* \* \* \*

"CCC–D–186— Denim; Unshrunk dated 3/30/44

"CCC–T–191b—Textile Test Methods, dated 5/15/51 and Amendment 1 dated 6/26/52

\* \* \* \* \* \*

*"Military Specifications:*

"JAN–D–504— Dyeing and Aftertreating Processes for Cotton Duck and Twill dated 9/30/47

\* \* \* \* \*

"Material to Be Furnished by the Contractor: All materials and findings not to be furnished by the Government, including all labels, are to be furnished by the contractor and shall conform to requirements set forth in the applicable specification.

"Note: Federal Specification CCC–T–191b, dated 15 May 1951 and Amendment 1 dated 26 June 1952, 'Textile Test Methods', form a part of this Invitation for Bids.

"Provisions Relating to Material to Be Furnished by the Government:

"a.  *Material To Be Furnished By The Government:*

| | Unit Price |
|---|---|
| Cloth, Cotton, Denim, 9.85 oz., OD-7, Unshrunk, 28″ ........... | $.53 per yd. |

\* \* \* \* \* \*

"Chemically Treated Government Furnished Property:

"Prospective contractors for this procurement are advised that the Government Furnished Property to be supplied in connection with the contract will be pre-treated with certain chemical agents for the purpose of rendering the finished product resistant to the ravaging effects of mildew, rot, termites, or other natural elements encountered in use. Operators coming in direct contact with the Government Furnished Material or working in a room where excessive concentrations of dust and lint therefrom fill the air may be subject to certain adverse physical reactions. An instructional booklet entitled, 'Occupational Health Protection and Your Army Contract', outlines the problems involved and suggests preventive measures by the adoption of which the possibility of experiencing any difficulties or ill effects arising out of the use of the treated materials may be reduced to a minimum. A copy of this booklet will be furnished to prospective contractors upon request to the purchasing office.

\* \* \* \* \* \*

"Samples:  Two samples will be available for inspection at this installation at all times. In addition, a limited number of samples will be available to bidders and may be borrowed upon receipt of $10.00 each. Certified check or money order, made out to the order of the Treasurer of the United States, will be accepted. These samples will be distributed, to the extent available, in the order in which applications and deposits are received.  \* \* \* "

The attached "General Provisions", hereinabove mentioned, provided (as amended by the Schedule) in pertinent part as follows:

" \* \* \*  2.  Changes

"The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes, within the general scope of this contract, in any one or more of the following: (i) drawings, designs, or specifications, where the supplies to be furnished are to be specially manufactured for the Government in accordance therewith; (ii) method of shipment or packing; and (iii) place of delivery. If any such change causes an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. Any claim by the Contractor for adjustment under this clause must be asserted within 30 days from the date of receipt by the Contractor of the notification of change: *Provided, however,* That the Contracting Officer, if he decides

that the facts justify such action, may receive and act upon any such claim asserted at any time prior to final payment under this contract. Failure to agree to any adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled "Disputes." However, nothing in this clause shall excuse the Contractor from proceeding with the contract as changed.

\* \* \* \* \* \*

"12. Disputes

"Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall, unless determined by a court of competent jurisdiction to have been fraudulent, arbitrary, capricious, or so grossly erroneous as necessarily to imply bad faith, be final and conclusive; provided that, if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision. \* \* \*"

Attached to the "General Provisions" was a document labeled "Additional General Provisions" which provided in pertinent part as follows:

"\* \* \* 22. Samples for Loan.—

"When available, a sample similar to the article described in the specifications, *but not necessarily in exact conformance therewith,* will be loaned to any responsible bidder upon request and a deposit (amount as shown in schedule) to insure its return without mutilation. This deposit will be refunded upon return of the article in good condition. The samples so loaned are to be returned within 10 days by insured parcel post or express, charges prepaid. Deposits must be submitted to this agency in the form of a certified check or money order made payable to the *Treasurer of the United States.* Deposits of cash will not be accepted. \* \* \*"

Also attached was a document labeled "Government Furnished Property Provisions", which provided in pertinent part as follows:

"\* \* \* 3. Government Furnished Property.—

"(a) The Government shall deliver to the Contractor, for use in connection with and under the terms of this contract, the property which the schedule or the specifications state the Government will furnish (*hereinafter referred to as "Government Furnished property"*). The delivery or performance dates for the supplies or services to be furnished by the Contractor under this contract are based upon the expectation that Government Furnished property of a type suitable for use will be delivered to the Contractor at the times stated in the schedule or if not so stated in sufficient time to enable the Contractor to meet such delivery or performance dates. In the event that Government Furnished property is not delivered to the Contractor by such time or times, the Contracting Officer shall, if requested by the Contractor, make a determination of

the delay occasioned the Contractor thereby, and shall grant to the Contractor a reasonable extension of time in respect of such delivery or performance dates. The Government shall not be liable to the Contractor for damages or loss of profit by reason of any delay in delivery of or failure to deliver any or all of the Government Furnished property, except that in case of such delay or failure, upon the written request of the Contractor, an equitable adjustment shall be made in the delivery or performance dates, or price, or both, and in any other contractual provision affected thereby, in accordance with the procedures provided for in the clause of this contract entitled 'Changes.' "

(b) As set forth above, the Invitation provided that the bags should conform to the requirements of "Military Specification MIL–B–2378a[A] dated 26 January 1951," with such exceptions as were set forth in the Invitation and the documents attached thereto. Said Specification, labeled "Military Specification, Bag, Barrack, O.D.", provided in pertinent part as follows:

"1. Scope

"1.1 This specification covers an olive drab, cotton denim, barrack bag, of one type and size.

"2. Applicable Specifications, Other Publications, and Drawings

"2.1 Specifications.—The following specifications, of the issue in effect on date of invitation for bids, form a part of this specification:

"Federal Specifications
    *     *     *     *     *

"CCC–D–186— Denim; Unshrunk

"CCC–T–191— Textiles; General Specifications, Test Methods, and Supplement thereto.
    *     *     *     *     *

"Military Specifications

"JAN–D–504— Dyeing and Aftertreating Processes for Cotton Duck and Twill.
    *     *     *     *     *

"3. Requirements
    *     *     *     *     *

"3.2 Materials.

"3.2.1 *Denim, unshrunk.*—The denim shall conform to type II, class C of Specification CCC–D–186.

"3.2.1.1 *Color and treatment.*—The denim shall be vat-dyed by piece, yarn, or stock dyeing, to match the approved shade of olive drab No. 7 * * *, and water-repellent and mildew-resistant treated, conforming to type I, class B of Specification JAN–D–504. The denim shall be singed, desized, and finished in such a manner as to produce a fabric with satisfactory sewing qualities.
    *     *     *     *     *

"3.2.3 *Rope, cotton, solid braided, No. 6, ⁹⁄₁₆-inch diameter, MRT.*—The cotton rope shall conform to type II of Specification MIL–C–2519.
    *     *     *     *     *

"3.3.1.1 *Types of stitching.*—Stitching, except bar-tacking, shall conform to Specification DDD–S–751, as follows:

For all stitching except the stitching indicated by "Z" on drawing ........ Type 301, 8–10 stitches to the inch.

For stitching indicated by "Z" on drawing ........ Type 401, 8–10 stitches to the inch. The chain portion of the stitching shall not appear on the outside of the bag.

"3.3.1.1.1 *Type 301 stitching.*— Thread breaks in stitching shall be

backstitched not less than 1-inch at each break. Stitching shall be backstitched at the ends to prevent raveling, except where ends are turned under in a hem or held down by other stitching. Thread tension shall be maintained properly so that there will be no loose stitching and that the lock will be embedded in the center of the materials sewed.

"3.3.1.1.2 *Type 401 stitching.*—Thread breaks in stitching shall be overstitched not less than 1½ inches at each break. Thread tension shall be maintained properly so that there will be no loose stitching."

(c) As shown in subparagraph (a) above, Federal Specification CCC–D–186 was listed in the Schedule under "Reference Specifications," and as set forth in subparagraph (b) above, was also made a part of Military Specification MIL–B–2378A. Said Federal Specification CCC–D–186, "for Denim; Unshrunk", dated March 30, 1944, provided in pertinent part as follows:

"A. Applicable Specifications.

"A–1. The following Federal specification of the issue in effect on date of invitation for bids, shall form a part of this specification:

CCC–T–191, Textiles; General Specifications, Test Methods.

"B. Types, Classes, and Grade.

"B–1. *Types.*—Denim shall be of the following types, as specified in the invitation for bids:

"Type I.—Whiteback.

"Type II.—Colored Filling.

"B–2. *Classes.*—Types I and II shall be of the following classes, as specified in invitation for bids:

"Class A.—2.45 yard
B.—2.20 yard
C.—2.00 yard
D.—1.78 yard.

\* \* \* \* \* \*

"E. Detail Requirements.
"E–1. *Construction, weight, and breaking strength.*—
"E–1a. Type I denim shall be made with colored warp yarn. The filling yarn shall be white or tinted.

"E–1b. Type II denim shall be made with colored yard in both the warp and filling.

\* \* \* \* \* \*

"E–2 *Finish.*—The cloth shall contain not more than 14 percent for Class A and 13 percent for Classes B, C, and D of finishing (nonfibrous) materials."

(d) Military Specification JAN–D–504, dated September 30, 1947, and labeled "Joint Army-Navy Specification—Dyeing and Aftertreating Processes for Cotton Duck and Twill", is referred to in the Schedule, as set forth in subparagraph (a) above, as well as in Military Specification MIL–B–2378A, as set forth in subparagraph (b) above. It provided in pertinent part as follows:

"A. Applicable Specifications.

"A–1. The following specifications, of the issue in effect on date of invitation for bids, form a part of this specification:

\* \* \* \* \* \*

"Federal Specification
"CCC–T–191—Textiles; General Specifications, Test Methods, Supplement thereto.

"B. Types and Classes.
"B–1. *Types.*—Dyeing process for cotton duck and twill covered by this specification shall be of the following types, as specified in the contract or order (see par. H–2):

"Type I —Vat dyeing.
"Type II —Mineral dyeing.
"Type III—Sulfur dyeing.

"B–2. *Classes.*—Aftertreating process for cotton duck and twill covered by this specification shall be of the

following classes, as specified in the contract or order (See par. H–2):

"Class A—Water-repellent after-treating process.
"Class B—Water-repellent and mildew-resistant after-treating process.

\* \* \* \* \* \*

"E. Detail Requirements.
"E–1. *Dyeing.*—

"E–1a. *Type I.*—The fabric shall be dyed with sulfur-free vat dyestuffs.

"E–1a(1). *Preparation.*—Fabric containing sizing to be dyed with type I process, shall be desized so that the dyed fabric shall contain not more than 1½ percent sizing.

\* \* \* \* \* \*

"E–2. *Aftertreating.*—
"E–2a. *Class A.*—

"E–2a(1). *Water-repellent.*—Fabrics finished by class A process shall be made water-repellent by the use of waxes alone, or in combina-

tion with soap and/or aluminum acetate (or formate). Other water-repellent treatments may be used if approved by the contracting officer for Army purchases and the bureau concerned for Navy purchases.

\* \* \* \* \*

"E–2b. Class B.—

"E–2b(1). *Water-repellent.*—Fabric finished by class B process shall be made water-repellent as specified in paragraph E–2a(1).

"E–2b(2). *Mildew-resistant.*—Fabrics finished by class B process shall be made mildew-resistant by the deposition of a mildew inhibitor in the fabric. The kind and minimum and maximum amounts of inhibitor shall be as specified in the contract or order. (See par. H–2.) \* \* \*

"E–2b(2)b. *Army.*—Unless otherwise specified, duck and twill shall be made mildew resistant in accordance with the requirements shown in table II."

TABLE II.—*Methods and materials for mildew-resistant treatment*

| Types | Method | Inhibitor | Percent of inhibitor on total weight of finished fabric | Method of application |
|---|---|---|---|---|
| I and III... | 1 | Dihydroxydichlordiphenylmethane. | 1.25±0.25.............. | 2 bath-aqueous. |
| | 2 | Dihydroxydichlordiphenylpropane. | 1.25±0.25.............. | 2 bath-aqueous. |
| | 3 | Tetrabromorthocresol..... | 1.25±0.25.............. | 2 bath-aqueous. |
| II [1]........ | 4 | Copper ammonium carbonate. | 1.00±0.10 as copper.... | Aqueous. |
| I, II, and | 5 | Copper ammonium fluoride. | 1.00±0.10 as copper.... | Aqueous. |
| III. | 6 | Copper 8-hyroxy-quinolinolate. | 0.25±0.05 as copper.... | 1 bath-aqueous and mineral spirits. |
| | 7 | U.S. Army Specification 100–17. | | |

[1] Shall have 1 ounce of dihydroxydichlordiphenylmethane per gallon of wax emulsion applied in the water-repellent treatment.

"H. Notes.

\* \* \* \* \* \*

"H–2. Requests, requisitions, schedules, and contracts or orders should specify the following features:

"(a) Title, number and date of the specification.

"(b) Type and class required. (See pars. B–1 and B–2.)

"(c) Finished width of cloth, if required. \* \* \*

"(d) Color required. * * *

"(e) Kind and minimum and maximum amounts of mildew inhibitor. (See par. E–2b (2).)

"(f) Place of final inspection. * * *"

3. (a) Plaintiff obtained a copy of the Invitation For Bids and, in accordance with the provisions contained in paragraph 22 of the Additional General Provisions, set forth in finding 2(a), procured a sample barrack bag. Attached to the sample bag was a tag stating in pertinent part as follows:

"*Important!* This Is Not A Standard Sample, Applicable Specifications, Cited In Invitation And Bid Or Request And Proposal (Negotiated Procurement) When Issued, Govern Construction Requirements For This Sample."

It is not shown what the exact nature of the sample bag material was, but plaintiff considered it to be denim.

At that time, plaintiff, under a contract (N50M–10856) with the Marine Corps, was engaged in producing utility caps out of a herringbone twill cloth. Under this cap contract, cloth, described as "Herringbone Twill, Green, 9 oz., 40"," was likewise supplied by the Government, and one of the applicable specifications pertaining thereto (Military Specification MIL–C–15782B (MC)) provided, as hereinafter more fully set forth, that such cloth "shall be closely singed, mercerized, and shall contain not more that 2 percent of sizing or other nonfibrous material * * *."

By general appearance and feel, the herringbone twill cloth then being used in the cap contract and the cloth contained in the sample barrack bag had, insofar as weight, flexibility, and general sewing characteristics are concerned, substantially the same qualities. Plaintiff had encountered no sewing quality difficulties in producing the marine caps with the sewing machines it had. Furthermore, plaintiff's employees and officials construed the specifications referred to in the Invitation For Bids, especially paragraph 3.2.1.1 of MIL–B–2378A, set forth in finding 2(b), providing that "The denim shall be singed, desized, and finished in such a manner as to produce a fabric with satisfactory sewing qualities", and paragraph E–1a(1) of JAN–D–504, set forth in finding 2(d) providing that "Fabric containing sizing to be dyed with type I process, shall be desized so that the dyed fabric shall contain not more than 1½ percent sizing", to mean that the denim cloth to be furnished by the Government would be desized so as not to contain more than 1½ percent sizing and that such cloth would be flexible and have satisfactory sewing qualities. Since the specifications for the herringbone twill used for the marine cap contract provided that such cloth "shall contain not more than 2 percent of sizing or other nonfibrous material", and the general appearance and feel of the cloth in the sample bag and the herringbone twill cloth were similar, plaintiff concluded that the denim cloth for the barrack bags would have substantially the same flexibility and sewing qualities as the marine cap herringbone twill. Plaintiff assumed that the denim cloth for the barrack bags would, insofar as sewability is concerned, conform substantially to that contained in the sample bag. Accordingly, although no one in plaintiff's employ knew anything about the manufacturing or weaving processes relating to denim in particular or textiles in general, or the aftertreatment or dyeing processes relating to denim, or the difference between sizing and other non-fibrous materials, either insofar as understanding the various provisions of the several specifications relating thereto or otherwise, plaintiff felt safe in using some excess yardage remaining from the marine cap contract herringbone twill for test production purposes as a basis for computing its costs in submitting a bid for the barrack bag contract. Assuming the accuracy of plaintiff's interpretation of the applicable specifications, and the correctness of its assumption that the denim cloth to be supplied would, insofar as

sewing qualities were concerned, be substantially similar to that contained in the sample bag and the marine cap herringbone twill, plaintiff's decision to so use the marine cap herringbone twill for test production purposes was reasonable.

(b) Military Specification MIL–C–813, dated July 28, 1949, entitled "Cap, Utility" was also applicable to said Marine Corps contract, and provided in part as follows:

"3.  Requirements

"3.1.  Standard sample.—In all respects not specifically covered by this specification, the utility cap shall be equal to the standard sample.  (See 6.2.)

\*  \*  \*  \*  \*  \*

"3.3  Material.

"3.3.1  *Cloth.*—The cloth shall be cotton herringbone twill, olive drab, conforming to Marine Corps Specification titled 'Cloth, Cotton, Herringbone Twill.'

"3.3.2  *Duck.*—The cotton duck shall be No. 8 hard texture, gray, conforming to type I of Marine Corps Specification titled 'Duck; Cotton, Plied Yarn (Army, Numbered, and Tent-Duck).'

\*  \*  \*  \*  \*  \*

"3.6  Stitches, seams, and stitching.—All seaming and stitching shall conform to stitch type 301 or 401 of Specification DDD–S–751, with not less than 12 stitches to the inch. When stitch type 401 is used, the looper or under thread shall be on the inside of the cap.

"3.7  Crown.—Crown shall be made of one piece of material and shall be provided with eight evenly spaced vertical darts, placed on inside of crown as follows: Two in front, two in back, and two on each side.  Darts shall be approximately 2¾ inches high, folded approximately 1¼ inches wide at bottom of cap, tapering to a point.  Front and back darts shall be double folded; the two front darts shall be turned to the front and the two back darts and the two side darts shall be turned to the back.

"3.8  Visor.—Visor shall be made of two-plies of herringbone twill, reinforced with an interlining of three-plies of duck.  Visor shall be quilted with seven rows of stitching, equally spaced.  Outside edge of visor shall be bound with a strip of the twill cut 1⅟₁₆ inches wide on the straight or bias, with the raw edges of the strip turned under and single stitched with type BSc–1.  Visor shall be single stitched to crown, outside band, and sweatband, and shall measure finished 2½ inches wide at center front.

"3.9  Outside band.—The outside band shall be cut approximately 3¼ inches wide and joined at back with seam type SSa–1 with seam opened and pressed.  Band shall be folded in half to form two-ply band.  Upper folded edge of band shall be single stitched to crown and lower raw edges of band and crown shall be turned under ⅜ inch and single stitched.  Band shall measure finished approximately 1¼ inches wide.

"3.10  Sweatband.—The sweatband shall be cut approximately 2 inches wide and joined at back with seam type SSa–1, with seam opened and pressed.  Lower raw edge of band shall be turned under ¼ inch and single stitched to inside of cap. Upper raw edge shall be turned under ¼ inch and single stitched.  Upper edge of band shall not be stitched to the cap.  Band shall measure finished approximately 1½ inches wide.

"3.11  Eyelets.—Cap shall be provided with four eyelets, two on each side, as shown on figure 1.  Eyelets shall be worked with thread and measure approximately ⅛ inch in diameter finished; or shall be made of brass, enameled green to match color of the cap, ⅛ inch inside diameter.

\*  \*  \*  \*  \*  \*

"6. Notes

\*   \*   \*   \*   \*   \*

"6.2 Standard sample may be obtained upon application to the Depot Quartermaster, Marine Corps Depot of Supplies, 1100 South Broad Street, Philadelphia 46, Pa."

Military Specification MIL–C–15782B (MC), hereinabove mentioned, provided in part:

"3. Requirements

"3.1 Standard sample.—The finished cloth shall be equal to the standard sample in all respects not specifically covered by this specification (see 6.2).

\*   \*   \*   \*   \*

"3.7 Finish.—The cloth shall be closely singed, mercerized, and shall contain not more than 2 percent of sizing or other nonfibrous material \* \* \*. The use of finishing or loading materials to increase weight or breaking strength will not be permitted.

\*   \*   \*   \*   \*   \*

"6. Notes

\*   \*   \*   \*   \*   \*

"6.2 Standard sample. For access to standard sample, address [the Philadelphia Marine Corps Depot of Supplies.]"

4. Using the marine herringbone twill material, plaintiff made up several barrack bags for the purpose of running time studies on the various operations required for the making of a barrack bag. First the parts were cut. The principal sewing operations involved thereafter were (a) sewing on four reinforcements on the inside of the seams, (b) sewing on each half of the bottom to each side of the bag, the bag having been cut in halves, (c) closing the bags, which consisted of joining the two halves together, the operation calling for going over eight thicknesses of material at two points, (d) bartacking the openings for the drawcords or rope and putting on the rope, and (e) hemming after the insertion of the cord, which was the last sewing operation. Thereafter, the bag had to be trimmed (for loose threads) and the requisite number inspected (principally for open seams), folded and tied into bundles.

The various sewing operations were performed by plaintiff's forelady, a competent and experienced employee, and timed by stopwatch so as to obtain a time study. In the performance of the time study, the various machines used for the several sewing operations were run at half speed, in order to allow a margin of safety. One adjustment was made on the machine used for the bartacking operation. Otherwise, all the machines used in the operation were used in their then form. The study established rates of production for each operator on the various operations on the basis of an 8-hour day, as follows: reinforcements, 250 bags; sewing bottoms, 450 bags; joining the halves, 480 bags; bartacking, 340 bags; hemming, 480 bags; trim, inspect, fold and tie, 480 bags; cutting, 4,000 bags spread 100-ply high.

On the above-described basis, the time study established direct labor costs as follows:

|  | Per bag |
| --- | --- |
| Sewing reinforcements | $0.0282 |
| Sew bottoms | .0150 |
| Join halves | .0150 |
| Bartack (drawcord) | .0200 |
| Hem | .0150 |
| Cutting | .0148 |
| Trim, inspect, fold & tie | .0150 |
| Bale | .0090 |
| Total labor | $0.1320 |

The various costs of the materials to be furnished by the contractor (rope, thread, baling supplies and marking materials) were obtained by securing quotations from suppliers and were calculated at $0.148 per bag. Overhead was calculated at $0.03 per bag and profit at $0.02 per bag. Thus, a base unit price of $0.33 was established. To this base unit price, freight was added for each destination, the prices to be quoted being

required to be based on f. o. b. destination.

The time study method of calculating a labor unit cost was plaintiff's customary method of obtaining such costs. Assuming the correctness of plaintiff's interpretations and conclusions concerning the nature of the denim cloth it would receive from the Government, as hereinabove set forth, the direct labor costs of $0.1320 which plaintiff calculated was reasonable.

5. (a) Based on the $0.33 unit price calculated as set forth in finding 4, plaintiff, under the name of "The Lilley-Ames Company, Inc.," on April 21, 1953, submitted its bid as follows: $0.356 per unit for 36,000 bags to be delivered during September 1953 at Charlotte, N. C., totaling $12,816; $0.359 per unit for 90,300 bags to be delivered during October 1953 at Memphis, Tenn., totaling $32,417.70; $0.355 per unit for 36,000 bags to be delivered during November 1953 at Read Valley, N. J., totaling $12,780; and $0.352 per unit for 54,300 bags to be delivered during November 1953 at New Cumberland, Pa., totaling $19,113.60, making a total of 216,600 bags at a total price of $77,127.30. In accordance with paragraph 22 of the "Additional General Provisions" (finding 2(a)) plaintiff returned the sample bag to defendant.

(b) On May 23, 1953, defendant conducted a survey of plaintiff's plant to ascertain, among other things, the condition and adequacy of plaintiff's equipment and whether any additional machinery was necessary to perform the proposed contract in accordance with plaintiff's bid. At that time, plaintiff had, in two plant locations, 65 single-needle machines, 28 double-needle machines, and 12 bartackers, as well as 3 cutting tables, a spreader, and 4 knives. The machinery was all in good condition, and two Plant Survey Reports, one for each plant, so indicated, as well as the fact that no machinery was lacking for the performance of the contract. As a result of the survey, the Surveying Officer recommended that plaintiff be awarded the entire quantity of 216,600 units for which it bid. Plaintiff itself had contacted the Singer Sewing Machine Company to ascertain what machines would do the job most efficiently and felt assured its equipment was adequate for the purpose.

(c) On May 26, 1953, defendant issued to plaintiff, also under said name of "The Lilley-Ames Company, Inc." a "Supply Contract" Award on the basis of the bid submitted by plaintiff, the Contract consisting of the Invitation For Bids, the Bid, the Schedule, the General Provisions and the Award, together with any documents attached thereto.

6. When the Government-furnished denim was received by plaintiff, it was considerably stiffer and heavier than both the cloth in the sample bag which plaintiff had received and the marine cap herringbone twill out of which plaintiff had made the test production bags and upon which it had based its unit price. This factor adversely affected almost all of the various labor operations entering into the production of the bags. The following are some of the ways in which the various operations were so affected:

(a) *Closing the bag or joining the halves:* In making the test production bags, plaintiff had used a sewing machine for this operation which was called a "Wilcox & Gibbs off-the-arm fell lock" machine. This machine is generally not used for heavy sewing work, being considered a machine suitable for light or medium weight materials. However, it was able to perform the joining operation satisfactorily during the test runs, going over the eight thicknesses described above without difficulty. This type of machine has folders on it to make double-needle work and to fold the seam under. On the material furnished by defendant, this machine was unable to perform the operation, proving too light for the purpose. Plaintiff then tried to perform the operation with a heavier machine, called a "Union Special". However, this machine also was unsatisfactory for the purpose. Finally, a third

type of machine, being an extra heavy Union Special, was procured from out-of-town and this machine, which had a so-called "tractor feed" on it, did, after many adjustments, prove to be capable of performing the operation. Four of these machines were rented and utilized through the end of contract operations. However, considerable difficulty was encountered from time to time even with the extra heavy Union Special. Needles became hot and would frequently burn, bend or break. It was still difficult to feed the stiff material through the folder and the operation was considerably slowed down. The material would go through so thick that at times it would break the folder. Although that machine was set up for 4,500 stitches per minute, it was cut down to approximately 3,000.

(b) *The reinforcement operation.* A so-called "241 Singer" single-needle sewing machine was employed on this operation. Difficulty was encountered in getting the heavy material under the presser foot of the machine. Also, needles frequently broke on this machine and operation.

(c) *Sewing bottoms to sides.* First, the Wilcox & Gibbs and later the two-needle Union Special machines were also used for this operation. The operators had difficulty in feeding the material through the machine folder. Here, too, the material would on occasion go through so thick that the folder broke. Needles became hot and would burn or break, thus reducing the speed of the operation. For this operation too, the speed of the machines had to be reduced from 4,500 to 3,000 stitches per minute.

(d) *Hemming.* For this operation, a Singer 241 single-needle machine was used, and this machine, with an adjustment which enlarged the feeding surface, and with the use of heavier needles, was able to accomplish the work. However, here too the needles would bend, burn and break. The material was hard on the operators' fingers, burning and stinging them, which also contributed to the slowdown in the operation.

(e) *Bartacking the drawcord openings and the drawcord to the bag.* The material was so heavy it was not possible at first to get the presser foot on the bartacking machine high enough for the material to get under it. It was necessary to remove the presser feet, ground them off, and cut grooves in them so as to force the material in. A very large number of needles were broken in performing the bartacking operation. The speed of the bartacking machines had to be cut down to approximately 1,100 stitches per minute.

(f) *Cutting.* On the cap contract, the cutting machine, electrically operated, had successfully cut through 200 thicknesses of material. On the instant contract, plaintiff's estimate was based on cutting the denim in spreads of 100–150 high. However, the cutting knife was not able to go through these amounts. Plaintiff finally got down to spreads of between 50 and 75 thicknesses (plies) before the knife would go through, and even at these reduced amounts, the knife smoked.

7. The sewing machines, approximately 50 of which were used on this contract, broke down with such frequency, due largely to the stiff nature of the material, that a maintenance and repair mechanic, who was an independent contractor, was employed to remain on the premises full time during the performance of the sewing operations on this contract. Normally such a maintenance man would come in irregularly and only as needed. In this instance, an entire machine would sometimes be thrown out of operation as a result of a broken needle, requiring the immediate services of the mechanic. The machines required constant readjustment and new needles, and their speeds had to be cut down considerably. As a result, it was not possible to attain the speed of production originally estimated.

It is not shown, however, how much greater plaintiff's costs were by reason of having to maintain the machine maintenance man on a full-time basis than they would have been had he serviced

the machines on the normal, irregular basis.

8. Prior to the instant contract, plaintiff had never produced barrack bags. However, plaintiff's past experience in manufacturing clothing items and in tailoring work generally was sufficient to have enabled it to produce the bags successfully and without undue difficulty out of cloth with sewing qualities comparable to cloth in the sample bag or the herringbone twill. The sewing qualities of herringbone twill cotton cloth of the type plaintiff had used in its marine cap contract, and the cloth in the prebid sample bag, as well as in desized denim generally, are approximately the same. Both denim and herringbone twill are of medium weaves. Herringbone twill was, insofar as sewing characteristics are concerned, sufficiently similar to desized denim generally to constitute adequate experience for the use of such denim. Herringbone twill and denim are both cotton twills. However, there are differences in twill categories. Denim is a so-called broken type of twill, made out of long and short fibers, while the other has herringbone interlacings made out of combed-out long fibers only. The weight of the herringbone twill used for the cap contract was 9 ounces per square yard as against 9.85 ounces for the denim. Because the two materials differ in weave construction and the nature of the yarns involved, if no sizing or other nonfibrous materials were added to each fabric, the denim would be somewhat stiffer than the herringbone twill. Similarly, if equal amounts of sizing were added to each, the denim would also be stiffer, since the interlacing in the herringbone weave construction would not permit the sizing to adhere as well. However, these differences in weight, weave and construction would not, as between desized herringbone twill of the type used in the cap contract and desized denim of the weight and weave herein involved, result in substantially different sewing characteristics. The bags made from the Government-furnished denim were much more difficult to make than were the time study bags plaintiff made from the herringbone twill.

Had the denim cloth furnished by defendant possessed substantially the same sewing qualities as either the herringbone twill cloth or the sample bag cloth, plaintiff's original equipment would have been adequate to permit the production of the number of bags called for by the contract within the time limits provided by the contract. With such equipment and cloth, plaintiff could have produced as high as 4,000 bags per day, assuming no other delay-causing factors. However, with such equipment, and the cloth actually furnished, it was not possible for plaintiff to achieve any such rate of production, the production per machine being greatly reduced.

9. The denim cloth furnished by defendant to plaintiff was manufactured for defendant by the Cone Export and Commission Co., Inc. of New York City. The cloth was made to accord with the requirements of Type II, Class C of Federal Specification CCC–D–186, which permitted up to 13 percent of finishing (nonfibrous) materials. It was not desized by the manufacturer, nor was it treated for water resistance, water repellence, or mildew resistance. Tests made by defendant in the U.S. Army Quartermaster Corps Laboratory on 47 samples of the material showed that its "size content" ranged from a low of 8.35 percent to a high of 12.1 percent, with an overall average for all the samples of 9.7 percent.

10. (a) Sizing is an additive chemical which is put into the material before it is woven. It is inserted to prepare the warp yarns for the weaving operation and to facilitate such operation, giving a cohesiveness to the fibers in the yarns and preventing the fabric from deteriorating as a result of the weaving process. It gives a stiff, almost wire like, characteristic to the fiber, and is commonly referred to as a starch. In the manufacture of the cloth by the Cone Company, sizing was also added after

the material was woven. Being an additive, and not a part of the fiber itself, it is referred to as a nonfibrous material. There are other nonfibrous materials, such as waxes and pectins, which are part of the growth process of the fiber itself. On the other hand, there are nonfibrous materials which are added to the fiber during the manufacturing process, of which sizing is an example. Others are soaps, detergents, oils, dye bath salts, and additives designed to impart special finishing characteristics to the cloth. For instance, additives may be used to give the cloth water, mildew or fire repellent or resistant characteristics. As set forth above, sizing itself was added to the material herein involved as part of the finishing process, in addition to that added as part of the weaving process. All of these materials are included in the term "nonfibrous material." However, since the addition of sizing tends to stiffen the fabric, where identical cloth and weave are involved, that which has the greater amount of sizing would be the stiffer.

(b) The terms "sizing" and "nonfibrous material" are not synonymous, since "nonfibrous material" encompasses "sizing." Desizing is a process for removing the starch. The removal is normally effected by means of an acid which converts the sizing starch into a soluble form which can then be washed out. Such removal is usually effected in preparation for bleaching or dyeing. The finishing process encompasses the early processes after weaving, such as cleaning the fabric to remove from the fiber certain ingredients so that it will be more absorptive for the dyeing operation, dyeing, pressing, and applying additive finishes, such as water-repellant treatment.

On cotton material which is not desized, such as denim, the bulk of the nonfibrous material is normally made up of sizing. Cloth containing as much as 9 percent total nonfibrous materials would normally not be desized. Generally, sized denim of the type commonly used

commercially has a total of between 9 and 12½ percent of nonfibrous materials.

(c) The material furnished by the Government to plaintiff for the production of the barrack bags involved in the instant contract contained approximately 10 percent of total nonfibrous materials, the bulk of which, or approximately 7 percent, consisted of sizing. It was not water-repellent, or mildew-resistant treated.

11. The denim supplied by defendant to plaintiff for the performance of the instant contract was piece and not yarn dyed, i. e., it was made with colored yarn in both the warp and filling.

12. Generally, production of articles from denim cloth which has the normal amount of nonfibrous materials and sizing of the type used commonly in commercial channels, as set forth in finding 10, would be from 30 to 50 percent less than production from desized denim, assuming the same type of machines were used on both materials. Assuming the weaves are similar, sized denim is boardy and stiff whereas desized denim is softer and easier to handle. The making of articles out of sized denim requires a different plant setup than the making of articles out of desized denim, for which lighter machinery is used. The use of sized denim in such machinery would produce the difficulties described above, would slow up production, and would result in higher production costs.

Sized denim containing approximately 10 percent of nonfibrous materials, such as was furnished to plaintiff herein, is commercial grade and commonly used in the sewing and textile industries. Approximately 250 million square yards of 9.85-ounce denim are used in the United States yearly, and the great majority of this yardage contains 9–12 percent of nonfibrous materials, including sizing. Commercial denims are for the most part sized denims, and a shop set up to fabricate items from such material would not have difficulty in handling it. However, as set forth above, a shop set

up to handle only softer, more flexible material, such as desized denim, of which a very large amount is also in use, including Government items, would have considerable difficulty in employing sized denim.

13. (a) On September 24, 1953, plaintiff sent to the contracting officer the following letter:

"We are in production on Contract TAP 1903 for Bag, Barracks and I want to explain some of the difficulties we have encountered.

"When we were preparing our bid for the above item we had the loan of a Government Sample and our computations were compiled by using this bag as a basis.

"Upon receiving our initial shipment of Government furnished materials we were surprised to find that this material was of a heavier texture than the government sample. Because of this our costs in the cutting, sewing of bag where two seams crossed and the shipment of the bags, were underestimated.

"Our machines for the closing of the two halfs [sic] of the bags would not sew this material so we had to acquire machines with tractor feeds. In laying the furnished materials we found we could cut through only 75 ply whereas the sample bag material could be cut at 150 ply. Finally in computing the weight per bale for our freight costs we underestimated the weight per bale by 12 lbs.

"Considering the above difficulties and the circumstances which caused them, we are requesting an additional .01 per unit over the contract price.

"Your consideration in this matter will be greatly appreciated."

(b) By letter of October 5, 1953, the contracting officer replied as follows:

"Reference is made to above-listed contract and letter of 24 September 1953 requesting an additional $.01 per unit over the contract price

due to the heavy texture of the Government Furnished Material supplied you.

"Confirming telephone conversation, 30 September 1953, you are advised that material furnished you was of a type and weight as specified in applicable Invitation and Bid which is part of your contract.

"The Government sample of the Bag, Barrack furnished you was for use as a guide in indicating the general lines of manufacture of this item. Your contract and specifications govern the materials to be furnished and the actual manufacture of this item. Therefore, in accordance with our telephonic agreement, your request for additional compensation is considered withdrawn."

14. By November 5, 1953, plaintiff had become delinquent in its deliveries and, on that date, wrote to defendant with respect to such delinquency, as follows:

"In order to eliminate the delinquency on the above contract we have made a complete shakeup in our production schedule. We are breaking in new operators and have incorporated some of the sewing operations thus speeding up the production. Since this change, we have almost doubled our daily production.

"However we are having trouble with the bartacking of the cord. This operation is causing us much trouble and expense in needles. Because of this one operation we are building up a backlog of bags up to the bartack operation. Just as soon as we can find some method of eliminating the difficulty on this one operation, we will be able to eliminate the delinquent items.

"Because of the hard finish of the government furnished materials, which was not anticipated when our bid was submitted, we had to put on a second shift. We are using two shifts at the present time.

"Everything possible is being done to overcome delinquent deliveries."

At some time subsequent to such letter, but prior to January 20, 1954, plaintiff requested a $0.12 increase in the unit price of the barrack bag on account of the alleged defective cloth furnished by defendant. By letter of that date, defendant requested a cost breakdown to substantiate plaintiff's request and by letter of February 17, 1954, plaintiff responded, as follows:

"In reply to your letter, * * * dated 20 January 1954, the following cost breakdown on Contract TAP 1903 OI 1961–E–53 for Bag, Baracks is submitted:

| | |
|---|---|
| Sewing Reinforcements ......... | .053 |
| Sewing Bottoms to sides ........ | .035 |
| Joining Sides ................. | .026 |
| Bartacking rope & openings ..... | .052 |
| Hemming tops ................. | .056 |
| Cutting ...................... | .04 |
| Trim, Inspect Fold & Tie ........ | .015 |
| Bailing labor ................. | .009 |
| Total Labor cost per bag .... | .286 |
| Total Material Cost per bag .. | .146 |
| Total ................... | .432 |
| Average Contract Price per unit less freight ................. | .33 |
| Gross loss per bag ............. | .102 |
| Adjustment requested in claim ... | .12 |
| Available for overhead & Profit ................. | .018 |

"The above costs are actual resulting from the use of Government Furnished materials which are not suitable for sewing because of the texture of the materials after sizing.

"This company is a long established firm having manufactured articles of clothing and equipment using all types of textiles. We bid on this item expecting to receive a 9.85 oz denim with a sizing suitable for sewing. Instead we receive a material which could be considered as canvas.

"Because of the nature of the Government furnished materials the above breakdown of cost has resulted."

15. (a) In connection with its consideration of plaintiff's claim, defendant's representatives submitted, on March 8, 1954, five samples of the Government-furnished material to the United States Army Quartermaster Corps laboratory for testing. By a report dated March 16, 1954, the laboratory gave the results of its test as showing that "Sizing, Finishing & Other Non-Fibrous Material" ranged from 7.8 to 8.4 percent, with an average of 8.0 percent. The report shows the applicable "Requirements" to be "13.0 Max.", indicating that defendant's representatives considered paragraph E–2 of Federal Specification CCC–D–186 (finding 2(c)) to be applicable.

(b) Further in its review of plaintiff's claim, defendant's representatives caused an audit of plaintiff's books and records to be made by the Army Audit Agency. However, by letter of June 10, 1954, defendant advised that:

" * * * an attempt to review your claim by the Army Audit Agency resulted in a determination that the total cost breakdown submitted in your claim was inadequate and not subject to an accounting review.

"In view of the preceding paragraph, it is requested that you furnish the following data, in duplicate.

"a. A detailed cost, breakdown indicating normal costs incurred on subject item, wherein nondefective material was used.

"b. A detailed cost breakdown of increased costs claimed as a result of alleged defective material furnished by the Government.

"c. Any other data which you deem necessary to support your claim.

"Upon receipt of this information, this Office will endeavor to expedite your claim."

16. The contract was satisfactorily completed on or about June 17, 1954. By letter of that date to defendant, plaintiff responded to defendant's request contained in its letter of June 10, 1954 (finding 15(b)), as follows:

The following is a detailed breakdown of cost in determining the bid and the actual cost resulting from continued use of defective Government Furnished Material.

| Detailed Cost in Determining Bid | | Actual Cost Using Defective Government Furnished Material |
|---|---|---|
| Sewing Reinforcements | .0282 | .053 |
| Sewing Bottoms | .015 | .035 |
| Joining Halves | .015 | .026 |
| Bartacking | .020 | .052 |
| Hemming | .015 | .056 |
| Cutting | .0148 | .04 |
| Trim, Inspect Fold Tie | .015 | .015 |
| Bailing Labor | .009 | .009 |
| Total Labor Cost Per Bag | .1320 | .286 |
| Total Material Cost Per Bag | .148 | .146 |
| Total Production Cost | .2800 | .432 |
| Overhead | .03 | .030 |
| Profit | .02 | .020 |
| | .33 | .482 |
| Freight | .02608 | .02608 |
| | .35608 | .50808 |
| Net Loss Per Unit | | .152 |
| Net Loss in Dollars | | $32,923.20 |

"The above increased costs were incurred as a result of the Defective Government Furnished material. This material does not meet the specification in regard to the finish of the material. The specifications call for a cloth cotton denim, 9.85 oz. with a sizing, which would leave a fabric with suitable sewing qualities. The Government Furnished material did not have these qualities. The structure of the bag barracks was such that in sewing, the needle had to pass through from four to ten thicknesses of material. Using the type of material furnished by the Government, made these sewing operations much slower than if we were using material suitable for sewing. The cutting operation was also affected, because our knife would only cut through 75 ply and we had anticipated using 125 ply.

"Because of the nature of the finish of the Government Furnished Material on this Contract, we feel that we have a just claim.

"We manufactured the Barracks Bag by furnishing materials meeting specifications and when cutting the Government Furnished Material, used methods which would enable us to manufacture the bag according to specification and yet result in a savings of Government Furnished

Material. We have completed the Contract about 20,000 yards under the allowance.

"We hope, therefore, that you will give our claim careful consideration.

"Any additional information you may need, will be furnished upon request." ·

17. Sometime prior to October 6, 1954, plaintiff submitted three samples of the Government-furnished material for testing to a private laboratory (The United States Testing Company, Inc.). By a Report under that date, the laboratory advised plaintiff that the test, conducted in accordance with Federal Specification CCC–T–191b, showed that the samples contained "sizing, oil, wax, etc." ranging from 9.38 to 10.07 percent.

18. No decision having been made on plaintiff's claim prior to April 16, 1955, a conference was held sometime prior to that date between representatives of plaintiff and defendant. By the following letter dated April 16, 1955, plaintiff requested defendant to review its claim:

"After reviewing all of the specifications covering the manufacture of the Bag, Barracks under TAP 1903, we are more than ever convinced that our claim filed with your office is justified.

"Specification MIL–B–2378A, covering Bag, Barrack OD, states in Paragraph 3.2.1.1 that the denim to be vat dyed by piece, yarn or stock dyeing to match the approved shade of olive drab No. 7, conforming to Type I, Class B of specification JAND–504. The denim shall be singed, *desized* and finished in such a manner as to produce a fabric with a satisfactory sewing quality.

"Referring to Specification JAN–D–504; Type I Class B denim calls for Vat dyeing, water repellent and mildew resistant after treatment. Paragraph E–1a (1) of this same specification states as follows: 'Preparation: Fabric containing sizing to be dyed with *Type I* process shall be *desized* so that the dyed

fabric shall contain not more than 1½% sizing.'

"We have laboratory reports on three samples submitted for testing with [sic] shows that the GFM had from 9.95% to 10.07% sizing.

"Because of this excess sizing in the GFM, we suffered a loss of .1497 per unit on Contract TAP 1903 and therefore filed claim for an adjustment.

"We thank you for the courtesy extended our representatives at the conference and ask that you review this claim."

19. By letter of May 4, 1955, labeled "Decision and Findings of Fact", the contracting officer denied plaintiff's claim, stating in pertinent part as follows:

"I have your letter of 16 April 1955 in regard to your claim for additional compensation * * *.

· "Your claim is based on alleged defects in Government-Furnished-Property delivered under the subject contract. After carefully considering your claim, the undersigned hereby makes the following findings of fact:

"1. On or about 26 May 1953, Contract DA 30–352–TAP–1903, OI–1961–E–53 was awarded to your firm for 216,600 each Bag, Barrack, OD.

"2. Said contract provided that the Barracks Bags would conform with Military Specification MIL–B–2378A and that the Government would furnish the Cloth, Cotton, Denim, 9.85 ozs., OD–7, Unshrunk, 28″ for use in producing the same.

"3. Paragraph 3.2.1 of Military Specification MIL–B–2378A provides that the basic material for the Barracks Bag covered by the subject contract shall be Denim, and Unshrunk, conforming to Type II, Class C of Federal Specification CCC–D–186.

"4. Federal Specification CCC–D–186 provides that Type II Denim in its finished state may contain a

maximum of 13% sizing, finishing, or other non-fibrous materials.

"5. By letter of 10 November 1953, your firm filed a claim for additional compensation based on the allegation that the Government-Furnished-Property delivered under the subject contract possessed a hard textured finish and thus was not suitable for use in producing the Barracks Bags.

"6. The sizing in the Government-Furnished-Property delivered to your firm did not exceed 10.07% and thus conformed with the applicable specifications in this regard.

"7. The Government-Furnished-Property delivered to your firm was suitable for use in producing Barracks Bags covered by the subject contract.

"8. The payment of additional compensation to your firm is not authorized under Article 3 of the Government-Furnished-Property provisions and Article 2 of the General Provisions of the subject contract.

"In view of the foregoing findings, it is the decision of the undersigned that your claim be and the same is hereby denied. * * *"

20. By letter of May 19, 1955, plaintiff, acting pursuant to Article 12 of the Schedule (finding 2(a)), appealed the contracting officer's decision to the Armed Services Board of Contract Appeals. In its appeal, plaintiff stated that the contracting officer's decision was "in error because the Government furnished property delivered did not conform to the Specifications and resulted in increased costs amounting to a unit cost of $0.1497 per barrack bag." However, by its "Complaint" subsequently filed on November 28, 1955, plaintiff claimed it had "incurred additional labor costs and overhead, amounting to $36,742.94" (which amounted to an increase of $0.169 per unit). After both sides presented the testimony of witnesses and submitted exhibits, a three-member Army Contract Appeals Panel of said Board unanimously held, in a decision rendered on August 14, 1956, that plaintiff was entitled to an equitable adjustment. On the facts, the Board found that plaintiff had encountered unanticipated difficulties and increased costs by reason of the hard, stiff material furnished, stating, in pertinent part:

"The sample was examined to determine the nature of the material and the manner in which the bag was constructed. A pattern was made in accordance with it and the specifications. The latter were read as providing for cloth with a maximum of 1½ percent sizing. The texture of the cloth from which the sample was made appeared to be in conformity with that interpretation. Thereupon appellant selected some herringbone twill cloth left over from a previous contract, which was made with a different weave from denim but which had approximately the same sewing qualities. From this the forelady of the shop made several bags while the production manager timed each operation. Unit labor costs were prepared on the basis of the resulting figures and the daily pay of the operators who would do the work.

"When the Government-furnished material was received in the plant it was found to contain much more sizing than had been anticipated. Appellant's tests on samples indicated 9.38 percent to 10.07 percent, while the Government's indicated 7.8 percent to 8.4 percent. The effect was that the material was hard and stiff, which made it difficult to fabricate and awkward to handle. It was impossible to cut as many pieces at one time as had been estimated in preparing the bid because the cutting machine would not hold them. The texture of the cloth was such that the blades grew hot or broke when it was cut. The sewing

machines likewise were unable to operate efficiently because the needles burned out or broke.

"As a result of these conditions, production was slowed down, it became necessary to rent additional equipment and hire extra personnel, and maintenance and repair costs were greatly increased. The final costs of performance were substantially in excess of the estimates upon which the bid was computed. Appellant contends that the entire excess was due to the quality of the Government-furnished material, although there is some evidence in the record to the contrary."

After concluding that "The sole question in the case is whether the Government-furnished material contained too much sizing," the Board stated as follows:

"The Government contends that the sizing content of the denim is controlled only by Specification CCC–D–186 and that any amount up to 13 percent is in accordance with the contract. It is argued that Specification JAN–D–504 concerns only aftertreatment, that the deletion of the words 'water-repellent and mildew-resistant treated' from paragraph 3.2.1.1 of MIL–2378A eliminates aftertreatment, and that the entire reference to JAN–D–504 is thereby nullified. This argument is supported by the further contention that paragraph E–1b of CCC–D–186 contemplates that the yarn will be dyed before the cloth is woven and that JAN–D–504 can accordingly have no application.

"We cannot agree with this interpretation. The deletion of four words from paragraph 3.2.1.1 cannot be interpreted by any manner of construction as a deletion of the whole paragraph or of the referenced specification. The purpose of the deletion is not clear, but it may well have been merely to eliminate a redundancy. It is certain that after-treatment of the cloth was expressly provided for. Not only was the deletion of the four words insufficient to nullify it, but other provisions of the contract affirmatively so indicate. Page 8 of the schedule sets forth a warning to the contractor that the material would be so treated, with instructions in the premises. Exceptions to paragraphs 3.2.2.2 and 3.2.3 of MIL–B–2378A provide different specification references for the express purpose of so treating the thread and rope to be used in the bag. These provisions, along with the undeleted provisions of paragraph 3.2.1.1, indicate the clear intent of that specification to require that the cloth be treated in accordance with JAN–D–504.

"The requirement that the yarn of both warp and filling be colored is not a negation of the express terms of the contract and the principal specification. The conclusion that the yarn must be dyed before weaving rather than after is based upon inference rather than upon the terms of the specification in which the provision is found. Such an inference cannot be used to negative the express provisions of the contract and specifications which we have discussed.

"We therefore conclude that JAN–D–504 is applicable, including paragraph E–1a(1), requiring not more than 1½ percent of sizing.

"Even if this were not so, paragraph 3.2.1.1 of MIL–B–2378A requires that the denim be 'singed, desized, and finished in such a manner as to produce a fabric with satisfactory sewing qualities.' The only standard of judgment given to the appellant by which those qualities might be judged was the specifications which we have discussed and the sample on the basis of which the bid was prepared. While the contract made allowance for varia-

tion of this sample from specifications, there was nothing in it or in the specifications to indicate to appellant that the cloth to be supplied would be of a substantially different quality than that in the sample. The bid was prepared on such a basis, after comparison with the specifications. The subsequent delivery of cloth so finished that it was substantially more difficult to sew than the sample was not in full compliance with paragraph 3.2.1.1."

Based on the foregoing, the Board found "that the Government-furnished material was not fully in accordance with the specifications and that appellant is entitled to an equitable adjustment in the amount of the resulting increased cost of performance." However, the Board further concluded that since the claim "shows only the total cost of performance, with no segregation of increased costs due to the difficulty in working with the cloth and those due to other factors", and since "the contracting officer did not have the proof of these costs before him at the time he made his determination", the case would be referred back to the contracting officer "to determine the amount of the equitable adjustment in accordance with General Provision 2 of the contract" (finding 2(a)), with plaintiff to have "the right of further appeal in the event that it is aggrieved by that determination."

The Board's reference to plaintiff's claim consisting only of its "total cost of performance" was based upon plaintiff's testimony that plaintiff incurred a loss on the contract of $32,410.94.

21. (a) Upon the return of the case to the contracting officer for the determination of an equitable adjustment, plaintiff sought to have its alleged total loss of $32,410.94, as previously presented to the Board (finding 20) allowed as the amount of such adjustment. However, the contracting officer, by letter of December 19, 1956, to plaintiff, stated that "before an accurate technical evaluation" could be made "to determine an equitable adjustment with respect to de-

fective GFP [Government Furnished Property], it will be necessary to know by number the types and models of machines that were used under this contract." By letter of December 21, 1956, plaintiff refused to furnish such information "on the ground that it is not relevant to the determination of an equitable adjustment."

(b) Lacking any information other than plaintiff's total costs and the breakdown of plaintiff's original bid, the contracting officer requested the Quartermaster Corps' Manufacturing Division to supply him with such technical information as would enable him to make an equitable adjustment based on the increased costs caused by the defective material. That Division ran tests in making barrack bags out of the material actually supplied by defendant and of material not exceeding 1½ percent sizing. In making such tests, machines were used which the Division felt were similar or comparable to those which plaintiff had used, although, because of plaintiff's refusal to furnish the information, the Division was not certain that the machines used were in fact comparable.

Based on these comparative tests, the Division concluded that, as between the two materials, and assuming the use by plaintiff of the same kind of machines, difficulties would be encountered in only three of the sewing operations, i. e., the sewing of the bottoms, the joining of the halves, and the hemming. It was concluded that there would be a 40 percent decrease in production in those three operations.

Similarly, on the cutting operation, the Division concluded that there would be approximately a 25 percent differential between the materials.

Plaintiff's bid breakdown (finding 4) showed that plaintiff's labor cost estimate, on a per bag basis, was 1½ cents for each of the above-mentioned three sewing operations, or 4½ cents as the total estimate for the three operations. Increasing this 4½-cent cost by 40 per-

cent would give an increased cost therefor of 1.8 cents.

Similarly, plaintiff's bid breakdown showed an estimated cutting cost of 1.48 cents per bag. Increasing this by 25 percent would give an increased cost therefor of 0.37 cent.

Thus, the Division recommended to the contracting officer that the equitable adjustment should be the total of 1.8 cents on the three sewing operations, plue 0.37 cent on the cutting operation, or a total of 2.17 cents per bag.

Since plaintiff's claim as presented to the contracting officer was not made on any such basis, and did not include any claim for overhead or profit, but was simply a claim to recoup its overall losses, the Division made no recommendation for the addition of any specific amounts for overhead or profit.

(c) The contracting officer accepted the recommendation of the Manufacturing Division, and on January 14, 1957, issued his "Findings of Fact and Decision", which stated in pertinent part as follows:

"1. Contract No. DA–30–352–TAP–1903 (OI–1961–E–53) was awarded to you on 26 May 1953 for furnishing and delivering 216,600 ea. Bags, Barrack, O.D., for a total contract price of $77,127.30.

"2. The contract provides that these Bags shall conform to Military Specification MIL–B–2378A, dated 26 January 1951 with certain exception stated in the contract; and shall be fabricated from Cloth, Cotton, Denim, 9.85 oz., OD–7, Unshrunk (hereinafter referred to as "Denim") containing not more than 1½% of sizing, to be furnished by the Government.

"3. The Denim furnished by the Government under the contract contained substantially more than 1½% of sizing.

"4. This change in cloth furnished by the Government caused an increase in the contractor's cost of performance of the contract; and

pursuant to General Provision 2 of the contract entitled: 'Changes', the contractor is entitled to an equitable adjustment in the contract price therefore.

"5. An equitable adjustment for this change is $.0217 per Bag, Barrack, OD, applicable to 216,610 Bags delivered under the contract for a total increase in contract price of $4,700.44, which adjustment shall not be subject to the discount for prompt payment specified in the contract."

22. On January 18, 1957, plaintiff appealed to the Armed Services Board of Contract Appeals from the decision of the contracting officer as to the amount of the equitable adjustment, and on March 27, 1957, filed its complaint therein in which it sought the amount of $36,742.94 as its "increase in cost of performance resulting from the Government furnishing material not in accordance with the specification * * *." After a hearing before the Army Contract Appeals Panel of the Board, at which the testimony of witnesses and exhibits were submitted on behalf of both sides, and after the submission of briefs by the parties, in which plaintiff reduced its claim to $34,566.70, the Panel of three members unanimously decided on December 30, 1957, that the amount of the equitable adjustment should be $12,996.60 instead of the amount of $4,700.44 allowed by the contracting officer. The Board Panel stated in pertinent part:

"Appellant has submitted a considerable mass of oral and documentary evidence, much of which was included in the previous hearing and was directed at establishing the total costs of preformance and the amount by which such costs exceeded its bid. We have already held in our previous decision that that is not the proper measure of the amount due on account of the deviation. The burden is on appellant to prove the additional cost incurred because of the nonspecification Government-furnished fabric. There appears to

be nothing in appellant's records that shows the impact of the deviation upon the cost of performance. However, evidence was adduced as to the substantial extent to which specific operations were slowed down by the hard, stiff nonspecification material. This evidence is not in as satisfactory a form as we would like. However, evaluating it in conjunction with a full consideration of the records in both appeals, we are of the opinion that an increase of $.06 in the unit price will constitute a full and adequate equitable adjustment. We so find. This amounts approximately to a 35% increase in direct labor costs, together with overhead and profit of 22.8% and 6.5%, respectively, as included in appellant's bid estimate.

"The total contract price will accordingly be increased by a total of $.06 x 216,610 (number of bags delivered), or $12,996.60, instead of the amount allowed by the Contracting Officer."

At the hearing, there was testimony given by an expert witness offered by plaintiff that in using the type of hard Government-furnished material herein involved as compared with desized denim, there would, on the reinforcement sewing operation, be a drop in production of approximately 30 percent; on the sewing of the bottoms and joining the halves operation, the drop would be from 40 to 50 percent; and on the bartacking operation, the drop would be approximately 30 percent. On this basis, the Board's application of a 35 percent increase in labor costs to all of plaintiff's sewing operations was justified and was not arbitrary or capricious. Since plaintiff's estimated labor cost per bag was $0.1320 (finding 4), 35 percent thereof would add 4.62 cents to the unit cost.

Plaintiff's bid breakdown showed 3 cents per bag for overhead. As the Board found, this came to approximately 22.8 percent (22.72%) of the labor costs. The Board's application of this same percentage to the 4.62-cent labor increase would add 1.05 cents to the unit cost for such overhead.

Plaintiff's bid breakdown also showed 2 cents per bag as profit (finding 4). As the Board found, this came to approximately 6.5 percent (6.38%) of the total of labor (13.2¢), materials (14.8¢) and overhead (3¢), amounting to 31 cents bid on such items. The Board's application of this same 6.5 percentage to the new base of 17.82 cents for labor (13.20 bid + 4.62 increase), 14.8 cents for materials, and 4.05 cents for overhead (3¢ bid + 1.05 increase), totaling 36.67 cents, would add 2.38 cents for profit, instead of 2 cents bid by plaintiff, or an increase of 0.38 cent per bag.

Accordingly, the labor increase of 4.62 cents, the overhead increase of 1.05 cents, and the profit increase of 0.38 cent would result in a total unit price increase of 6.05 cents per bag. This was the basis upon which the Board found that an increase of 6 cents in the unit price constituted an adequate equitable adjustment.

23. (a) The amount of $12,996.60 found by the Board to constitute the equitable adjustment has been paid by defendant to plaintiff.

(b) Plaintiff contends that the Board's decision is arbitrary, capricious, and not supported by substantial evidence in that the sum allowed is insufficient and not truly representative of its reasonable and necessary costs expended and incurred as a result of defendant's furnishing nonspecification material. In all other respects, it relies on the Board's decisions. Plaintiff incurred a total loss of $28,-943.87 on the contract. It claims that this entire loss was due to defendant's having furnished sized denim instead of desized denim and that the Board should have allowed the said full sum of $28,-943.87, plus 6.45 percent profit thereon (the profit percentage included in its bid, and the percentage applied by the Board to the sum it did allow), or $1,866.88, making a total of $30,810.75. Crediting the amount of $12,996.60 which the Board allowed, leaves a balance of $17,-

814.15 for which plaintiff makes claim in this suit.

(c) Defendant contends that the decisions of the Board in finding that the material furnished did not comply with the specifications and in allowing $12,996.60 were arbitrary and capricious and were not based on substantial evidence. It has filed a counterclaim seeking judgment in said amount, plus interest.

24. As set forth in finding 23(b), plaintiff in this suit seeks to recoup its total loss on its contract operations. In the performance of the contract, plaintiff incurred direct labor costs of $46,-481.63. Applied to the 216,610 barrack bags delivered, the unit cost was $0.2146. As shown (finding 4), plaintiff's bid estimate for unit direct labor costs was $0.1320. The difference was, therefore, $0.0826 per unit, or $17,891.99 on the 216,610 bags delivered. The following shows how the actual cost of each sewing operation compared with the estimates thereof:

| Operation | Bid Estimate | Actual Costs |
|---|---|---|
| Sewing reinforcements | $.0282 | $.05254 |
| Sew bottoms | .0150 | .02668 |
| Join halves, close bag | .0150 | .02030 |
| Bartack | .0200 | .03687 |
| Hemming | .0150 | .02566 |
| Cutting | .0148 | .02901 |
| Trim, inspect, fold, tie | .0150 | .01968 |
| Bale | .0090 | .00383 |
| Total unit labor cost | $.1320 | $.21457 |

Plaintiff's overhead costs for the contract amounted to $28,720.40. Overhead is properly applied as a percentage of direct labor. Thus, the overhead rate so applied is 61.77 percent, which generally conforms to operations of this kind. Applying such percentage to the direct labor loss of $17,891.99 results in an overhead loss of $11,051.88. As shown (finding 4), plaintiff's bid applied an overhead rate of 22.8 percent of estimated labor, which was the percentage rate applied by the Board in making its equitable adjustment. On the basis of actual overhead rate experience, plaintiff underestimated and therefore underbid with respect to its overhead.

The direct labor loss of $17,891.99, plus the overhead loss of $11,051.88 resulted in a total loss of $28,943.87, as set forth in finding 23(b).

25. (a) Plaintiff attributes its total loss on its contract operations to the furnishing of sized instead of desized denim. There is nothing to show specifically that any other factor relating to contract operations contributed to the loss. There were problems of labor absenteeism, inexperience, and turnover, and these may have been contributing factors to higher labor costs, but it is not definitely shown that such factors were in any respect unusual or, if they did contribute to the higher costs, by how much. As shown by finding 24, the actual labor costs were over 8 cents per unit more than estimated, although the Board allowed an increase of only approximately 4.6 cents per unit. Percentagewise, the Board allowed a 35 percent increase in labor, while plaintiff actually incurred a total increase of over 60 percent. Nevertheless, insofar as increased labor costs due to the one factor of working with sized rather than desized denim is concerned, the record before the Board as well as before this court (findings 12, 22) supports the finding of the Board that a 35 percent increase in the labor costs would fairly be attributable thereto. This finding of the Board is not arbitrary or capricious and is supported by substantial evidence. The additional increases in labor costs which plaintiff incurred must have been due to other of the innumerable factors entering into contract operations, or at least plaintiff has not shown by the weight of the credible evidence that 100 percent of its increased labor costs was due solely to the one factor in question.

(b) As shown by finding 22, such a 35 percent increase results in adding 4.62 cents to the unit cost. Therefore, on the

216,610 bags, the increased labor cost allowed by the Board was $10,007.38. The Board allowed 22.8 percent of this amount as increased overhead, deriving this percentage figure from plaintiff's bid. As shown by finding 24, plaintiff's bid on this item was, based on the record now before the court, too low in light of its actual experience, and, where actual cost considerations are involved, it was error for the Board to make this allowance on a bid estimated basis. Plaintiff's actual overhead costs were 61.77 percent of its direct labor costs, which is reasonable. The application of this percentage to the $10,007.38 increased labor costs allowed by the Board would give plaintiff $6,181.56 for increased overhead expenses.

(c) The increase in the overhead figure would also cause an increase in the total profit allowance made by the Board. Here, the application of the profit ratio to costs of 6.45 percent which plaintiff calculated in its bid, and which the Board used, would be reasonable and proper. Plaintiff claims no more. Applying this ratio to the total of the increased labor costs of $10,007.38 and the increased overhead costs of $6,181.56, making a total increase of $16,188.94, gives a profit figure of $1,044.19.

(d) On the bases set forth above, the change order allowed to plaintiff by the Board should have been $17,233.13, instead of the amount of $12,996.60 which the Board did allow, a difference of $4,236.53.

26. As set forth in finding 23(c), defendant, by its counterclaim filed herein, seeks to recover the amount of $12,996.60 which was allowed by the Board and which has been paid to plaintiff.[16] One of the grounds for defendant's position is that, as a matter of law, the Board committed error in construing the contract and various specifications so as to require the furnishing of desized denim which would contain not more than 1½

percent sizing, as set forth in paragraph E–1a(1) of Military Specification JAN–D–504 (finding 2(d)). Defendant contends that this provision, which the Board held to be applicable (finding 20) was, when read in the light of the other contract and specification provisions, inapplicable, and that a proper interpretation of such contract and specifications permits the furnishing of cloth which would contain 13 percent "of finishing (nonfibrous) materials", as set forth in paragraph E–2 of Federal Specification CCC–D–186 (finding 2(c)), with which provision the cloth furnished herein did in fact comply (finding 9). Defendant further contends that, as a question of fact, the Board's decision to the effect that the cloth furnished did contain more than 1½ percent sizing was arbitrary, capricious, and not supported by substantial evidence. Defendant contends that the Board erroneously equated nonfibrous materials with sizing, that sizing is only one component of the total nonfibrous materials, and that the proof is not sufficient to show that there was more than 1½ percent sizing in the total nonfibrous materials contained in the cloth furnished by defendant to plaintiff. With respect to this factual contention, the Board's decision that the cloth contained more than 1½ percent sizing is, in view of the evidence before it as well as the additional evidence introduced before this court, not arbitrary or capricious, was supported by substantial evidence, and was in fact correct (finding 10(c)). Similarly, the other ultimate factual findings of the Board contained in its decision of August 14, 1956, including those relating to the effect that the sized denim had on plaintiff's operations, are also supported by such substantial evidence and are likewise correct (findings 6, 7, 8).

### Conclusion of Law

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter

---

16. Although this suit is brought in the name of "The Lilley-Ames Company Division of Bill Kay, Inc.", the Bill Kay, Inc. corporation itself agrees that, in the event defendant is successful on its counterclaim, it will be liable thereon.

of law that plaintiff is entitled to recover, and it is therefore adjudged and ordered that plaintiff recover of and from the United States the sum of four thousand two hundred thirty-six dollars and fifty-three cents ($4,236.53). It is further concluded that defendant is not entitled to recover and its counterclaim is dismissed.

