Stephenson, J.
 

 In order to intelligently pass on the demurrer herein, the petition, excepting therefrom the exhibits “A,” “B,” “C,” “D,” “E,” “F,” and “G-,” attached to the petition, and the answer, have been fully set out herein. Four of the exhibits are photostatic copies of the final and supplemental estimates on the two proposals that constituted the basis of the contract. These estimates portray the real bone of contention in this action, but because of their volume they are not set out and when necessary they will be referred to by their letter designation.
 

 The controversy grows out of Highway Project No. 183 in Brown and Highland counties. Because of the fact that the improvement was in two counties, two proposals were asked for by the State Highway Director, Numbers 1 and 2, but it was stipulated that the award was to be made to one contractor as one contract. The contract was designated “Unit Price Contract.” Relator thereupon submitted two proposals.
 

 In Proposal No. 1 we find the following specifications :
 

 
 *565
 
 “T-25 84,562 sq. yds. bituminous concrete
 
 1%"
 
 average compacted depth, using minimum of 7400 tons. Unit Price Bid 47 cts. Total Amount Bid $39744.14.”
 

 In Proposal No. 2 the following specification appears :
 

 “T-25 34,601.02 sq. yds. bituminous concrete surface course
 
 1%"
 
 average compacted depth using a minimum of 3028 tons. Unit Price Bid 47 cts. Total Amount Bid $16262.56.”
 

 We learn through the brief of counsel that T-25 is the trade name for the particular bituminous concrete required to be used on the project.
 

 Relator was awarded the contract for this improvement and it agreed and contracted to do the work and furnish all materials according to the plans, specifications and estimates of .the State Highway Director, at a stipulated price. This contract, after setting out the contract price, further provides that “The
 
 actual sum
 
 to be paid, however, will be the aggregate total determined by the work
 
 actually performed
 
 by the party of the second part, calculated upon the
 
 unit price
 
 set out in his proposal hereto attached and made part hereof.”
 

 The fact that this is a unit price contract cannot be escaped. A square yard of highway built according to plans and specifications was the ultimate unit. This unit, like most units, has component parts. Reference to the specifications makes it plain that each of them that could be calculated in square yards was so calculated.
 

 In each proposal we find the following specification, “1 ton of bituminous concrete in place (to establish unit price) $6.00.”
 

 The total yardage on this project was 119,163 sq. yds. The total tonnage of bituminous concrete was 10,428 tons. Reducing the tons to pounds we have 20,856,000 pounds. Dividing the number of pounds by the number of square yards we find that each square yard of highway of
 
 1%
 
 inches average compacted
 
 *566
 
 depth should, according to such specification, contain 175.02 pounds, or in round numbers 8.75 per cent of a ton of bituminous concrete. But, to use the vernacular of relator, the 1% inches average compacted depth just “would not take” the tonnage specified in the contract, but that it did take 9670.45 tons, making a difference of 757.55 tons between the estimated tonnage and the tonnage actually required to complete the work. Reducing the tons used to pounds, we have 19,340,900 divided by 119,163 sq. yds. which gives 162.3 pounds, or in round numbers 8.11 per cent of a ton. From this calculation we learn that 12.72 pounds or sixty-four one hundredths of one per cent of a ton per square yard less was used than was called for by the specifications.
 

 To whose benefit does this inure?
 

 Suppose, instead of being 757.55 tons long on tonnage according to the plans and specifications, it had developed that it was 757.55 tons short?
 

 Then the contractor would have had to furnish 757.55 tons more of bituminous concrete than was set forth in the specifications and, on the unit contract basis, he would have been entitled to receive pay therefor.
 

 The unit price contract is provided for by Section 1207-1, General Code: “The director may, if he deems it expedient, enter into any contract authorized by this act upon a unit price basis. Where a contract is entered into upon a unit price basis, the contractor shall be required to state in his bid the sum for which he offers to perform bach unit of each different kind or class of work and upon the completion of the work the quantities of each kind or class of work shall be measured and the contractor paid only for the quantities of work actually performed by him. Where the director elects to enter into a contract upon a unit price basis he may include in the estimate such reasonable sum as he may deem necessary to cover variations in
 
 *567
 
 the actual quantities of work as compared with the estimated quantities. In the event the actual compensation earned by the contractor exceeds the estimate, any such excess shall be paid from any funds of the department which might lawfully be expended upon the improvement in question. In the event the actual compensation earned by the contractor is less than the estimate, the saving shall inure to the benefit of the state.”
 

 Outside of the courts, the Auditor of State, the officer against whom this action is directed, has the last word in so far as the legality of state contracts is concerned. He is invested with the power under virtue of Section 243, General Code:
 

 “The auditor of state shall examine each voucher presented to him * * * and if he finds it to be a valid claim against the state and legally due, and that there is money in the state treasury duly appropriated to pay it and that all requirements of law have been complied with, he shall issue thereon a warrant on the treasurer of state for the amount found due, and file and preserve the invoice in his office. He shall draw no warrant on the treasurer of state for any claim unless he finds it legal, and that there is money in the treasury which has been duly appropriated to pay it.”
 

 Let it not be understood that this section renders the Auditor of State entirely immune to the extraordinary writ of mandamus. If a voucher representing a valid claim against, the state is presented to him, concerning which all the requirements of law have been complied with and it is legally due and there is money in the state treasury which has been duly appropriated to pay it, then the law specially enjoins on him as a duty resulting from his office the issuance of a warrant on the treasurer of state in payment of the claim, and the claimant is entitled to a writ of mandamus to secure his warrant if it is refused; but if the
 
 *568
 
 claim does not meet all these requirements, it is just as much his duty to refuse the warrant.
 

 Where a claim is questionable, the dictates of good sense and good business judgment impliedly at least demand that he refer it to the law department of the state for opinion, and be governed thereby.
 

 In the
 
 “General
 
 Clauses and Covenants”
 
 at
 
 Section 9 we find the following provision:
 

 “For all other than lump contracts, after the work is completed and before final payment is made therefor, the Engineer will make final measurement to determine the quantities of various items of work performed, as the basis for final settlement.
 
 The contractor, in all cases, will he paid for the actual amount of work performed in accordance with these specifications as shown hy the final measurements, if on a unit price basis.”
 
 (Italics ours.)
 

 The proposals contain the provision:
 

 “The contractor shall make the extension in this column and also add up the totals. However,
 
 the unit prices specified, together with the approximate quantities shall determine the total amount of the' hid.”
 
 (Italics ours.)
 

 It will be noted that the general clauses and covenants are most comprehensive and evidently were formulated with the purpose in mind that the state should get what it paid for. They provide against any advantage being taken by the contractor because of disputes as to material to be used and unforeseen conditions, as follows:
 

 “The bidder is required to examine carefully the site of, and the proposal, plans, specifications and contract form for the work contemplated; and it will be assumed that the bidder has investigated and is satisfied as to the conditions to be encountered, as to the character, quality and quantities of work to be performed and materials to be furnished, and as to the requirements of these specifications, special provisions
 
 *569
 
 and contract. It is mutually agreed that submission of a proposal shall be considered prima facie evidence that the bidder has made such examination.”
 

 They provide just what is to be included in the contract, namely: “The contract shall include the Notice to Contractors, The Proposal, Plans, Specifications, Special Provisions and Contract Bond; also any and all supplemental agreements required to complete the work in a substantial and acceptable manner.”
 

 Specifications are therein defined as follows:
 

 “The directions, provisions, and requirements contained herein as supplemented by such special provisions as may be necessary, pertaining to the method and manner of performing the work or to the
 
 quantities and qualities of materials
 
 to be furnished under the contract. Special provisions are specific clauses setting forth conditions or requirements peculiar to the project under consideration and covering work or materials involved in the proposal and estimate but not satisfactorily covered by these general specifications. Supplemental agreements are written agreements executed by the contractor and by the Director covering alterations necessary to the project * * *.” (Italics ours.)
 

 Also:
 

 “These specifications, the plans, special provisions, and all supplementary documents are essential parts of the contract, and a requirement appearing in one is as binding as though appearing in all. They are intended to be cooperative, to describe and provide for a complete work. In case of discrepancy, figured dimensions shall govern over scale dimensions, plans shall govern over specifications, special provisions shall govern over both specifications and plans.”
 

 The second paragraph of Section 2 reads:
 

 “The quantities listed in the proposal forms are to be considered as approximate and are to be used for the comparison of bids.
 
 Payments, except for lump
 
 
 *570
 

 sum contracts, will he made to the contractor only for the actual quantities of worh performed or materials furnished in accordance with the plans and specifications
 
 and it is understood that the quantities of work to be done and materials to be furnished may each be increased or diminished as hereinafter provided without in any way invalidating the unit bid prices.” (Italics ours.)
 

 The following provision is likewise included therein:
 

 “The Director shall decide any and all questions which may arise as to the quality or acceptability of materials furnished and work performed and as to the manner of performance and rate of progress of the work and shall decide all questions' which may arise as to the interpretation of the plans and specifications, and all questions as to the acceptable fulfillment of the contract on the part of the contractor,
 
 and as to compensation.
 
 His decisions shall be final and he shall have executive authority to enforce and make effective such decisions and orders as the contractor fails promptly to carry out.” (Italics ours.)
 

 Relator insists that under this contract there was but one “kind or class of work,” namely, the laying of the required yardage of roadway with a bituminous concrete surface to a stated average compacted depth. In this contention relator is right.
 

 Relator in effect further contends that bituminous concrete was merely the material to be used in the “kind or class” of work and that as no per ton bid was required under the contract, it in no wise entered into or became part of the contract. In this contention relator is wrong.
 

 Why the necessity for establishing a unit price of $6.00 per ton for bituminous concrete in place, if tonnage in no wise entered into the contract?
 

 Under this contract we assume that relator had its eyes open and knew just what it was doing when it submitted its proposals to the Director of Highways.
 
 *571
 
 It primarily proposed and ultimately agreed to furnish a minimum of 10,428 tons of bituminous concrete in the execution of the contract. We must also consider that the unit price of 47 cents per square yard was figured and fixed on that basis. We early learned that a unit is a single thing of any kind. But even the old fashioned unit had the attribute of divisibility. It had component parts. Just so has this contract unit.
 

 Relator delivered the yardage to the state, but in so doing he was not required to use the tonnage. What process of reasoning entitles relator to recover for material it did not use on this contract?
 

 If this court allows this writ, it must be because of the inviolability of the finding and decision of the Director of Highways and not because of any provision in the contract entitling relator thereto.
 

 Relator insists that the voucher executed by the Director of Highways is final, conclusive, sacrosanct and binding upon all persons, including the courts and the state, because the relator and Director of Highways have by their solemn contract said it should be. Let it be borne in mind that we are dealing with public moneys — the money of the state and its people — in this case. Well might we repeat those words of Cassius:
 

 “Upon what meat doth this our Caesar feed,
 

 “That he is grown so great?”
 

 In support of this contention, we are cited to the case of
 
 Baltimore & Ohio Rd. Co.
 
 v.
 
 Stankard,
 
 56 Ohio St., 224, 46 N. E., 577, 60 Am. St. Rep., 745, 49 L. R. A., 381. This case involved the Relief Department of the Baltimore & Ohio Railroad Company. Michael Stankard, an unmarried man, was an employee of the railroad company and a member of the Relief Department. While so employed, he became ill and died. His father and mother made application to the railroad company for sick and death benefits, which application was refused. They then brought suit against the railroad company. Amongst other things, the railroad
 
 *572
 
 pleaded a rule to which the deceased agreed when he became a member of the Relief Department. This rule provided that the action of the advisory committee of the Relief Department on applications for sick or death benefits should be final. This committee was the last tribunal to which the applicants could appeal, outside the courts. This court held in that case that after the rejection of a valid claim by the advisory committee, the beneficiary could maintain an action in the courts for the recovery of the money due thereon and that such rule is not a bar to the action.
 

 We fail to see where this law is germane to the instant case.
 

 Counsel likewise pin some faith to the case of
 
 State, ex rel. M. E. Murphy Co.,
 
 v.
 
 Donahey, Auditor of State,
 
 98 Ohio St., 442, 121 N. E., 645. In that case it was held that where a contract provided that “all measurements and determinations of quantities shall be made by the engineer, and his measurements shall be final and conclusive between the parties,” such measurements and determinations were final as a matter of law.
 

 We are in perfect accord with this law.
 

 This court boasts no engineering ability and would under no circumstances attempt to review measurements and determinations made by an engineer, particularly under a contract wherein the parties had agreed to accept his measurements and determinations of quantities as final.
 

 In the case of
 
 Bond
 
 v.
 
 Mayor and Common Council of Newark,
 
 19 N. J. Eq., 376, the court at page 382 held that a provision in a contract designating an official as final arbitrator gives him no power to dispense with the contract or anything that it requires in terms. “He * * * could dispense with no substantial matter expressly required by the contract. Such approval would not entitle the contractor to recover at law.”
 

 Again, at page 384 of the opinion, the court says:
 

 
 *573
 
 “If they [the public officers] should accept a pavement of blue flagstone, worth sixteen cents per foot, in fulfillment of a contract to pave with marble worth $16, without any abatement in price, they would exceed their powers as agents.”
 

 Giving to the Director of Highways all the final power that relator agrees that he has under the contract, we are still unable to find wherein he is given power to construe a contract. And if he were given such power under the contract, the courts could not and would not regard it as final and absolute so far as the state is concerned, for at least two reasons. In the first place, courts are jealous of their power and would hesitate to hold in such ease that an administrative officer could under any pretext be clothed with exclusive judicial power.
 

 We cannot escape the provisions of Section 1207-1, General Code,
 
 supra.
 
 If that section does not fit this case like a glove, it would be difficult to imagine a case that it would fit. We recur to it again. It applies to unit price contracts. Its applicability is expressed in the first sentence of the section, namely:
 

 “The director may, if he deems it expedient, enter into any contract authorized by this act upon a unit price basis.”
 

 This language is followed by a recital of the legal requirements of such contract, and the section ends with the following sentence:
 

 “In the event the actual compensation earned by the contractor is less than the estimate, the saving shall inure to the benefit of the state.”
 

 It was unnecessary to use the tonnage contained in the estimate to make the required yardage. Relator lost nothing by reason of this fact, unless it would be the profit on the bituminous concrete he did not use; consequently, the actual compensation earned by the contractor was less than the estimate.
 

 We grant that the excess tonnage could not be used;
 
 *574
 
 that relator delivered all the yardage that he was required to deliver under the contract, but this yardage was short on bituminous concrete content, as we have hereinbefore pointed out.
 

 We grant that there was an honest mistake in figures, but no one has been hurt. Relator bid so much per yard for the construction according to the content therein specified. It was unnecessary to use the content, and the saving, under the statute, all provisions in the contract to the contrary notwithstanding, inures to the benefit of the state.
 

 The demurrer to the answer will be overruled and a writ of mandamus denied.
 

 Writ denied.
 

 Weygandt, C. J., Williams, Matthias, Day and Zimmerman, JJ., concur.
 

 Jones, J., not participating.