**HARRISON CONSTRUCTION COM-
PANY, Plaintiff-Appellant,**

v.

**OHIO TURNPIKE COMMISSION,
Defendant-Appellee.**

**HARRISON CONSTRUCTION COM-
PANY, Plaintiff-Cross-Appellee,**

v.

**OHIO TURNPIKE COMMISSION,
Defendant-Cross-Appellant.**

Nos. 14782, 14783.

United States Court of Appeals
Sixth Circuit.

April 16, 1963.

175

John H. Leddy, Columbus, Ohio (Reed, Smith, Shaw & McClay, Pittsburgh, Pa., Porter, Stanley, Treffinger & Platt, Columbus, Ohio, Arter, Hadden, Wykoff & Van Duzer, Cleveland, Ohio, on the brief; John D. McIntyre, Pittsburgh, Pa., Lawrence D. Stanley, Columbus, Ohio, Sheldon S. Reynolds, Cleveland, Ohio, of counsel), for Harrison Const. Co.

John Lansdale, Jr., Cleveland, Ohio (Lockwood Thompson, Gen. Counsel, Ohio Turnpike Commission, Squire, Sanders & Dempsey, Cleveland, Ohio, on the brief), for Ohio Turnpike Commission.

Before MILLER, Circuit Judge, DARR, Senior District Judge, and BOYD, District Judge.

BOYD, District Judge.

This appeal and cross-appeal arise out of a contract entered into in January 1953, between the Ohio Turnpike Commission and the Harrison Construction Company, a Delaware Corporation engaged in heavy highway and industrial construction work. In 1952 the Commission advertised for bids for the construction of the easternmost 5.2 miles of the Ohio Turnpike. Harrison was the successful bidder, the contract price for the construction being $3,519,250.05.

The Harrison Construction Company (hereinafter referred to as the contractor) brought suit against the Commission in the District Court alleging that in the course of the construction herein it had encountered a number of delays due to the fault of the Commission and further alleging that in each instance complained of the Commission had breached duties owing to the contractor under the within contract.

The case was heard by the District Court without a jury in a trial which spanned some several weeks. The District Court found against the contractor in its first claim, which charged that it

sustained damages in the amount of $568,812.02 as a result of a breach of the Commission's contractual duty to provide adequate parcels of right-of-way for the orderly prosecution of the work. The contractor now alleges that certain prejudicial errors were committed in the course of the trial as to this claim and that the District Court's findings as to same are clearly erroneous. Such is the nature of the contractor's appeal. On certain other claims set out by the contractor in its amended complaint the contractor prevailed in the District Court. From the judgment of the District Court relating to these latter claims, the Commission has taken a cross-appeal.

### 1. *The Contractor's Appeal.*

The contractor, who is the appellant herein, was given notice to commence work under the contract on February 3, 1953. The contract called for completion of the work in its entirety within 300 days from this date. On February 3, the commencement date, only 45% of the necessary right-of-way had been made available by the Commission. The entire right-of-way needed for the construction project was not acquired until after approximately June 1, 1953. Certain revised work schedules were submitted by the contractor and approved by the Commission during the course of the construction with the end result that the work herein was not completed by the contractor until September 15, 1954, over 300 days from the acquisition of all rights-of-way in June 1953 and well over 400 days from February 3, 1953, the commencement date. The contractor claimed in the District Court that its delays were attributable to the lack of rights-of-way and alleged damages in the aforesaid amount of $568,812.02. The contract provision allegedly breached by the Commission is as follows:

> "In general, sufficient rights-of-way for an orderly prosecution of the work will be available on Contract date."

The contract further provided that the successful bidder was obliged to become familiar with the availability of right-of-way areas and prepare work schedules accordingly. The defenses here relevant which were interposed by the appellee Turnpike Commission are that the delays suffered by the contractor were attributable to the weather conditions in the Spring of 1953 and to the contractor's failure to properly plan its work schedule according to the rights-of-way it knew or should have known were available. In effect, then, the appellee did not deny it failed to furnish the requisite rights-of-way herein. In fact, it expressly admitted in its answer such failure. It did deny, however, that this failure was the proximate cause of the allegedly damaging delays. As to this claim by the contractor the District Court in its findings of fact stated:

> "Plaintiff has not proved by the preponderance of the evidence that the delay sustained by it in its operations was due to any failure on the part of defendant to provide right-of-way."

As its conclusion of law the District Court said:

> "Defendant is not liable to plaintiff for the amount claimed or any other amount because of its failure to furnish plaintiff with adequate right-of-way because plaintiff's damage, if any, was not proximately caused by such failure."

As its first assignment of error the appellant claims that a judicial admission by counsel for the appellee in his opening statement precluded the above finding and conclusion. In the opening statement counsel admitted that on the date the appellant was ordered to commence work there was insufficient right-of-way available for the orderly prosecution of the work. Counsel then conceded that the appellant was liable for any damage proximately resulting from the appellee's failure to furnish the necessary right-of-way. In this opening statement counsel also stated:

> "With respect to the right-of-way claim I think the evidence will show

that the damage proximately re-sulted (sic) from the Commission's failure to provide sufficient right-of-way did not exceed $50,000."

The appellant claims that the appellee by this "judicial admission" conceded that there had been a breach of the contract as alleged and that such breach caused damage to appellant in the amount of $50,000.00 *at the least.* Thus, reasons the appellant, the only question before the District Court on this claim was the amount recoverable in damages, questions concerning breach of contract and causation having been foreclosed by judicial admission. It is claimed that the District Court's finding of lack of causal connection between the breach of contract and the damage alleged is thus patently erroneous in the light of the alleged judicial admission above quoted.

■ We do not view this language of counsel in his opening statement as being a judicial admission of causation.

"In the trial of a cause the admissions of counsel, as to matters to be proved, are constantly received and acted upon. They may dispense with proof of facts for which witnesses would otherwise be called."

Oscanyan v. Winchester Repeating Arms Company, 103 U.S. 261 at p. 263, 26 L.Ed. 539 (1880). In this trial, however, proof was taken on the question of causation. There was no insistence by the appellant during the trial that the appellee was bound by any admission as to causation in his opening statement. The opening statement, moreover, was clearly inconsistent with the appellee's pleadings, evidence and closing argument. That portion of the opening statement in question is not free of equivocation and no attempt was made by the Court or opposing counsel to determine the purpose of the remarks. The conclusion which urges itself at this time is that it occurred to no one at the trial that the remarks in question constituted an admission of the nature here urged. Because of the binding effect of judicial admissions, opportunity is usually afforded counsel to explain and qualify such statements as here involved before conclusive action is taken on the strength thereof. Oscanyan v. Winchester Repeating Arms Company, supra, at p. 264, 26 L.Ed. 539. We do not find appellee so bound by these opening remarks to the court where it appears they were neither intended as binding nor accepted as such.

The District Court rendered an oral opinion as to the right-of-way claim herein, stating that the plaintiff had not sustained its burden of showing that its damage was caused by the appellee's delay in furnishing the requisite rights-of-way. The damage complained of was found to be due primarily to adverse weather conditions in the early months of 1953. The appellee had, in its pleadings, assigned the adverse weather conditions as one explanation for the plaintiff's damage. Appellant now maintains that the burden was upon the Commission to prove that the weather conditions caused the damage herein because this is an affirmative defense under Rule 8(c), Federal Rules of Civil Procedure, Title 28, U.S.C. We are referred to state laws here as if we were undertaking in a diversity case to determine whether matter should be pleaded as a denial under Rule 8(b) or as an affirmative defense or avoidance under Rule 8(c). See Moore's Practice, Second Edition, Vol. 2, Para. 8.27(2), page 1843. We must determine whether, in a breach of contract action, proximate cause of the damage alleged is part of plaintiff's prima facie case under Ohio Law. If it be such, then the defenses which are here concerned are but specific allegations in denial of the plaintiff's cause of action. See 21 O.Jur.2d, Evidence, Sec. 161.

■ The question of whether such causation is a part of plaintiff's prima facie case herein is elementary, but not squarely addressed for our purposes in the Ohio authorities. In 1916 this court dealt with a case involving the failure of the City of Dayton, Ohio, to furnish a certain right-of-way. The contractor sued for damages allegedly arising from

such failure on the part of the city. Pitt Construction Company v. City of Dayton, 237 F. 305 (C.A. 6) 1916. At page 311 this court said:

"These views would entitle plaintiff to recover * * * if it should be proved that the damages claimed were the direct result of the city's breach of its covenant to furnish the right of way."

The Court of Appeals of Ohio cited this language in 1959 in Nix, Inc. v. City of Columbus, 111 Ohio App. 133, 171 N.E.2d 197. The Nix case also involved a contractor's claim for damages arising from the failure of a municipality to furnish adequate right-of-way for the work therein. In the first paragraph of the syllabus the following appears:

" * * * and, where, notwithstanding such delay, the contractor completes such work, he may recover damages for the delay caused by such failure to acquire the necessary right of way."

Cf. Worth and Blessing v. City of Dayton, 16 Ohio Law R. 261. We conclude that a showing of causal connection between the breach of contract alleged and the damage allegedly suffered is part of appellant's prima facie case on which it sustains the burden of proof. We perceive no error by the District Court in this regard.

The appellant assigns error in the District Court's admission into evidence of certain reports made on the job by one of appellee's contracting engineers. The testimony is that the reports were a combination of recorded observations made on the job site by the engineer, Jerome F. Nollen, and reports which certain field personnel were required to submit to him. The reports in question were apparently first referred to in the trial during the appellant's direct examination of witness Nollen. Appellant had called Nollen as its own witness and counsel for the appellant asked him to recall what he had recorded in his reports concerning the availability of the rights-of-way and its effect on the construction work. Counsel for the ap-

pellee then urged that his voluminous reports be made available for reference by the witness. The reports were in the courtroom and were readily made available.

On cross-examination, counsel for the appellee directed Nollen to refer to his reports for any notations therein concerning the weather conditions during the period in question and their effect on the work's progress. Counsel for the appellant objected to testimony by the witness concerning notations made in one column of the reports. This column was headed "Not working due to wet conditions." The reports also contained a column for general weather conditions for the day and a column for the temperature on that day. One column was headed "Working," another "Not Working," and the column in question, as mentioned, was headed "Not working due to wet conditions."

A colloquy followed this objection, in the course of which the District Judge asserted that it was the court's understanding that the reports were to be used to refresh the memory of the witness as to the impressions Nollen received on the job at the time and that such use of the reports had been agreed upon by the parties. Counsel for the appellant then stated in effect that there was no objection to the use of the reports to refresh the witness's memory, but that use of the reports in order to support the engineer's mere opinion as to why the contractor was not working on certain days, the very issue before the court, was objectionable. It should be observed here that just such an "opinion" with the backing of the reports had been elicited from the witness, Nollen, on direct examination by the appellant shortly before its objection to appellee's cross-examination. The appellant as above noted had requested information from the witness's reports concerning the effect of right-of-way availability on the work progress. Court and counsel then generally agreed that the "Not working due to wet conditions" notations merely reflected the observations made by the engineer at the time

and the impressions this witness received on the job site during the course of the work. After ascertaining that it was clear to the Court and opposing counsel that the actual decisions as to when work was to be done were the contractor's and not the witness's, counsel for appellant agreed, and we think clearly, to this use of the reports by Nollen. Nollen then testified at length concerning the weather conditions on the job and the effect of the weather on the work as he perceived it, all with the aid of the reports. Notations as to most of the work dates in question were covered in the cross-examination of Nollen. Subsequently the reports themselves were tendered by the appellee and admitted into evidence. It is to the reception in evidence of these reports that appellant now takes issue. The reports themselves were heavily relied upon by the District Court in finding against the appellant on this claim. The trial court's oral opinion clearly reflects this. In its determination that the weather, primarily, and not the failure to furnish right-of-way was the proximate cause of the appellant's damage, if any, the court referred to the reports, commenting that it found no reason to doubt the accuracy of the notations therein.

No charge of error is made by the appellant regarding Nollen's testimony concerning the effect of weather conditions on the work progress. Indeed, as above indicated, the appellant acquiesced in the use of the reports by Nollen in his testimony and in the reception of the testimony concerning the "Not working due to wet conditions" notations for what they were worth. Thus the reports themselves merely reiterated Nollen's testimony. Moreover, the United States Weather Bureau reports for the days in question were in evidence without objection and generally corroborated the witness Nollen's reports aforesaid as to the weather conditions. There was other evidence sufficient to sustain the District Court's findings. It is impressive that aside from Nollen's testimony, the record reveals a lack of correlation between the work done during the months in question and the amount of right-of-way available. In this regard the record discloses the following:

| Month | Right-of-way Available | Amount of Excavation (Cubic Yards) |
|---|---|---|
| February ......... | 45% | 21,800 |
| March ........... | 53% | 2,777 |
| April ........... | 62% | 15,904 |
| May ............ | 85% | 22,418 |
| June ............ | 87% | 130,000 |

It is to be noted that with 85% of the right-of-way available in May, little more excavation was done than was the case in February, when only 45% was available. In June all of the right-of-way became available and there was a marked upsurge in the amount of excavation work done. However, June also brought an end to the rainy season as disclosed in the Weather Bureau Reports. As noted by the District Court in its oral opinion, there is a correlation between the weather conditions and the work progress, while there is none ascertainable between the right-of-way availability and the construction progress in the early part of 1953. Certainly the alleged erroneous admission of these reports in this action tried by the court is not ground for reversal where there is other substantial evidence sufficient to sustain the court's findings. Jackson Furniture Company v. McLaughlin, 85 F.2d 606 (C.A.9) 1936; Anglo-California National Bank v. Lazard, 106 F.2d 693 (C.A.9) 1939, cert. den. 308 U.S. 624, 60 S.Ct. 379, 84 L.Ed. 521 (1941); Bailey v. Sears, Roebuck & Company, 115 F.2d 904 (C.A.9) 1940, cert. den. 314 U.S. 616, 62 S.Ct. 82, 86 L.Ed. 495 (1941).

The appellant further contends that the court's findings herein are clearly against the weight of the evidence. Upon due consideration of the entire record in the cause we conclude that this contention is without merit; that the findings of fact by the District Court are

not clearly erroneous and must be affirmed. Rule 52(a), Federal Rules of Civil Procedure, Title 28, U.S.C.

2. *The Turnpike Commission's Cross-Appeal.*

The District Court found in favor of the contractor herein, Harrison Construction Company, on three of the claims in its amended complaint. The Ohio Turnpike Commission, the cross-appellant, assigns a number of errors in the trial court concerning these claims. Each of these claims deals with the effect of the contractor's having encountered "unsuitable material" in the course of construction of the turnpike. It was not unforeseen that such material would be encountered by the contractor. The contract between the parties for the construction of the turnpike provided for the removal of unsuitable material at a set price to be paid the contractor. "Unsuitable material" as referred to herein alludes to ground material which, because of excess vegetation content, excess moisture content, or like shortcoming cannot be used as support or embankment material.

In connection with one of these three claims in the amended complaint it is alleged that at certain locations along the turnpike the contractor encountered unsuitable material. The contract required the contractor to attempt compaction of the various materials encountered. If the contractor determined that any such material was unsuitable it was to request that the Commission order its removal. The amended complaint alleges that on the aforesaid locations the contractor requested an order of removal but that the Commission delayed unreasonably in ordering same and required unreasonable methods of removal, all to the contractor's damage. The Turnpike Commission admitted that unsuitable material was encountered on these sites, but denied unreasonable delay and unreasonable requirements on its part. The District Court found against the Commission on these issues with respect to this particular claim and awarded damages in the sum of $11,067.08. The Commission contests here the court's findings as to only one of the three areas involved in this claim. As to the factual determination concerning this one area, we hold upon examination of the record the trial court did not clearly err. Rule 52(a), Federal Rules of Civil Procedure, Title 28 U.S.C.

In another area of construction, a similar situation was presented concerning unsuitable material. As to this site, however, the amended complaint charged that the contractor's damage was sustained by virtue of its having to traverse with heavy machinery an area of unsuitable material, the removal of which the Commission had unreasonably delayed. The District Court found that notwithstanding observations by the Commission's resident engineer that the contractor did experience hauling difficulty in this area and notwithstanding a request for the material's removal by the contractor, the Commission delayed unreasonably in ordering said removal. The District Court on this claim awarded damages to the contractor in the amount of $52,643.47. These factual findings by the District Court are also uncontested.

The measure of damages employed by the contractor and adopted by the District Court on the two claims aforesaid is the first subject of error assigned by the cross-appellant. That the difference between the reasonable cost of doing the work in the absence of delay and the actual cost of doing the work is the proper measure of damages is agreed. However, the Commission insists that the District Court erred in adopting the contractor's bid estimate as the reasonable cost of doing the work in question in the absence of delay. It is further urged by the Commission that the claimed "actual costs" of doing the work herein were not proved to be the contractor's actual costs in fact.

With regard to the bid estimate as proof of the reasonable cost of doing the work without unreasonable delay, we agree with the United States Court of Claims that use of such estimates should

be approached with "trepidation." Such use in the absence of safeguards may indeed constitute unwarranted assumptions that the bid estimates are reasonable and accurately computed. Oliver-Finnie Company v. United States, 279 F.2d 498 (Ct.Cl.) 1960; F. H. McGraw & Company v. United States, 130 F.Supp. 394, 131 Ct.Cl. 501 (1955). From the record, the District Court's findings and the acquiescence of the Turnpike Commission in the Court's findings of unreasonable delay as to all but one of the locations herein we can only conclude that the fact of damage in these areas is settled. The measure of damages only is in real dispute at this point. We find no direct authority either in the Ohio or federal cases on the issue of whether or not a bid estimate may be used and relied on as here. There are cases in which the courts have not countenanced the use of bid estimates where there is evidence from which actual costs are disclosed or inferable. See Gulf States Creosoting Co. v. Loving, 120 F.2d 195 (C.A.4) 1941, in which case a companion cause before the court clearly reflected the excessiveness of the damages computed by use of the bid estimate therein. Cf. Lilley-Ames Co. v. United States, 293 F.2d 630 (Ct.Cl.) 1961, wherein the court had a choice between actual cost figures and bid estimate figures, choosing the former. See also Great Lakes Dredge & Dock Co. v. United States, 96 F.Supp. 923, 119 Ct.Cl. 504 (Ct.Cl.) 1951. In another Court of Claims case the court balked at using the bid estimate therein involved, but because there was no evidence and no finding of fact reflecting actual expenses and costs, concluded that it had no alternative, Oliver-Finnie Company v. United States, supra. There are cases from this court in which bid estimates had been utilized but their use toward proving damages was apparently not in issue, City of Lima, Ohio v. Farley, 7 F.2d 40, at pp. 41 and 42 (C.A.6) 1925; Grand Trunk Western R. Co. v. H. W. Nelson Co., Inc., 116 F.2d 823 (C.A.6) 1941.

In the Grand Trunk Western case, this court considered the propriety of the use of a certain equipment rental schedule in determining a contractor's damages. In concluding that the use thereof was not to be arbitrarily rejected, but weighed by the jury along with other evidence, this court said at p. 838:

"Determination of damages for breach of a contract is an inexact science and the sum reached by whatever method used will never be more than an approximation. This impossibility of precise determination is generally recognized and the law does not require mathematical certainty. Recognizing the evidential difficulties inherent in fixing damages to inflexible monetary terms, the law adjusts itself to the exigencies of the business world * * *.

* * * * * *

"The questioned evidence here is not so indefinite or uncertain as to require its rejection and the results, opinions and estimates are not without basis in fact and do not lead to obviously improbable results."

A foundation, though somewhat sketchy, was laid for the use of the bid estimate herein. Mr. Harrison, president of the contractor, testified as to the method by which the unit prices were computed and generally as to what factors, based on his fifteen years of experience, entered into the computation. The conditions to be encountered on the job were elaborately detailed in the Plans and Specifications prepared by the Commission. On cross-examination of one of the witnesses counsel for the Commission elicited testimony to the effect that the detail and completeness of the Plans and Specifications were outstanding. The Specifications held the bidding contractors to careful examination of the conditions disclosed therein and also in the Plans and required them to acquaint themselves with the actual areas of construction. This, Harrison, testified was carefully done by the contractor. The bid

estimate resulted. We do not think the bid estimate herein is to be arbitrarily rejected, but the fact that bid estimates are made with an eye to the competition's bids should be considered, as well as evidence as to how the actual conditions compared with the expected conditions. These factors were brought out in the trial, counsel for the Commission attempting to establish that there was disparity between the conditions as anticipated and conditions as actually encountered. The inferences which could be drawn from the testimony thus adduced vary. The inference to be drawn was for the trier of fact.

■ The Commission further urges that evidence of the conditions as actually encountered is in the possession of the contractor, thus rendering the bid unduly speculative and unnecessary. It is proposed that the contractor could have compared certain nonclaim areas on this job with the areas here subject of claim in order to get a clearer picture of the contractor's reasonable cost of doing the work in the absence of unreasonable delay. The factor to be borne in mind as to this contention is that the contractor did not do the work unhampered by delay. The contractor was forced to do the excavating and hauling herein with unreasonable delay. The first situation mentioned never existed on these areas. In an attempt to determine what the situation would have been under other circumstances comparison of costs in other areas of construction does not appear to be clearly preferable to the use of the bid estimate, when some foundation for the latter is laid. Again, counsel for the Commission brought out in the testimony that each area differed with respect to the materials encountered, the conditions encountered, and the equipment necessary for the particular materials and conditions met. This is indeed a troublesome area in the law of damages, but the fact of damage as stated appears certain for which there should be relief. The District Court's use of the bid estimate in the computation of damages as an approximation of what the reasonable cost of the work would have been, absent unreasonable delay, was, therefore, not error.

■ From an examination of the record we further conclude that the ownership-use schedule used by the contractor in the trial for the purpose of showing its equipment costs on the site in question was not so inherently improbable in its reflection of the major item of the contractor's expenses, machinery costs, as to have required its rejection. Grand Trunk Western R. Co. v. Nelson Co., Inc., supra. In view of the testimony relating to the ownership-use schedule, explaining the derivation of the cost-accounting figures used therein and in view of the lack of evidence indicating the schedule's unreliability as in Gulf States Creosoting Co. v. Loving, supra, the District Court did not err in relying on this schedule for the award of damages sustained by the contractor as a result of the unreasonable delays and unreasonable requirements found by the District Court.

■ For purposes of the next question considered it may be said that the contract for the construction of the Turnpike provided for two types of excavation—E-1 or roadway excavation and E-3 or channel and ditching excavation. The contract consisted of a number of documents, as is customary in construction contracts of this magnitude. For our purposes the contract consisted of the Plans, Specifications, and Proposal. The Plans herein, which were made available to the bidding contractors in order for them to formulate their bids, indicated that the work entailed 44,000 cubic yards of top-of-slope and toe-of-slope ditching. The purpose of such ditching system is to provide drainage effective for the prevention of washing of slope areas along the Turnpike. This ditching work was also contained in the Specifications and defined therein as E-3 excavation. However, on the Proposal form submitted to the bidding contractors by the Commission, the E-3 excavation item contained only 2,120 cubic yards. The 44,000 cubic

yards total top-of-slope and toe-of-slope ditching was either completely omitted from the Proposal or was included under the E–1 excavation item, which exceeded one million cubic yards. The evidence is that the latter situation obtains. In the course of construction it was called to the Commission's attention by the contractor that the amount of E–3 excavation contained in the Proposal form was inadequate. Upon discovery that the E–3 item of the Proposal did not contain the top-of-slope and toe-of-slope ditching, the Turnpike Commission directed that this ditching be done at the E–3 unit bid price of $.75 per cubic yard, rather than the E–1 unit bid price of $.60 per cubic yard. The contractor insisted that the within ditching was extra work and attempted to negotiate with the Commission for a higher price for this work, since this type of ditching requires hand labor and special equipment. The parties stipulated in the District Court that in the event the ditching in question was found by the Court to be extra work under the contract the contractor would be entitled to $21,255.06 as its damages. The District Court found that the contractor, by virtue of the omission of this work from the Proposal, had not actually bid on the work in question and was entitled to the stipulated amount as damages. We think this was error.

The sole question presented is whether or not the ditching herein was extra work. This determination is dependent upon the provisions of the contract. In the General Specifications "extra work" is defined as follows:

"Extra work is unforeseen work made necessary by alteration of plans or necessary to complete the work for other reasons, for which no specific price or compensation is provided in the contract."

Was this work unforeseen? It would appear not. The uncontradicted evidence discloses that the contractor's employee whose duty it was to examine in detail the Specifications and Plans made written note of the top-of-slope and toe-of-slope ditching work to be done. The Specifications clearly defined this work as E–3 excavation. Was there a specific price given in the contract for this work, that is, E–3 excavation? Clearly so, since under the Proposal the E–3 excavation was bid at $.75 per cubic yard. This is what the contractor was paid and this is all to which it is entitled. This was a unit-price contract similar in many respects to the contract involved in State ex rel. S. Monroe & Son Co. v. Tracy, 129 Ohio St. 550, 196 N.E. 650 (1955). We must find here, as in that Ohio case, that the contract required the contractor to examine the Plans, Specifications and construction sites. Under the contract we assume the contractor "had its eyes open" and bid on the E–3 excavation with knowledge that it contained the top-of-slope and toe-of-slope ditching. That the contractor failed to notice its own notations of contract requirements can hardly render the ditching herein "unforeseen." It is true that the contract provided a method whereby discrepancies between the numerous contract documents were to be resolved and that the Proposal was to ultimately control over the Plans and Specifications in the event of a discrepancy. But here we are not so much concerned with a "discrepancy" as we are with the question of whether the ditching work was "unforeseen" in order to qualify as "extra work" under the contract. We are therefore obliged to conclude that with respect to this claim, Claim 5(b) of the amended complaint, the work herein was foreseen under the contract and that the District Court erred in its award of the stipulated damages aforesaid to the contractor.

■ Claim 5(d) of the amended complaint herein embraces the charge that in the summer of 1954 the contractor due to the fault of the Commission had been forced to halt its paving activities in order to remove unsuitable material from certain areas of the construction site referred to in the record as Station 1189 plus 75 to Station 1187 plus 75 and Station 1194 to Station 1201. Some surfac-

ing in these areas had taken place in the fall of 1953, but the materials placed had not been compacted by the contractor, nor had the areas been paved. After the contractor ceased work for the winter in 1953 water seeped through these materials, which had been laid but not compacted. The water did not drain off and caused the areas to be unstable when paving was to commence the following June. Each of the parties herein attempted to place upon the other the fault for the contractor's having to remove the unsuitable material. The contractor claimed that the Commission ordered materials placed in these areas which precluded proper drainage and that because of the contractor's delay in ordering removal of other unsuitable material in the vicinity of these areas the paving could not be accomplished before the onset of winter. The Commission took the position that the materials it ordered placed in these areas would have created no problem if the paving had been seasonably done by the contractor, but that the contractor ceased its paving activity in the fall of 1953 of its own accord and took the risk that precipitation over the winter might render the subgrade in these areas unsuitable. The District Court found for the contractor on this claim awarding damages to the contractor in the amount of $7,112.13. The District Court's findings of fact on this claim generally state what appear to be the uncontested facts, but give us no benefit of what the crucial facts concerning the above contentions were found to be. We find ourselves unable to adequately treat of the questions raised as to this claim in the absence of findings by the District Court indicating its basis for decision. Rule 52(a), Federal Rules of Civil Procedure, Title 28 U.S.C.; Alexander v. Nash-Kelvinator Corp., 261 F.2d 187 (C.A.2) 1958.

As to the matters raised in the contractor's appeal, the District Court is affirmed. As to the questions raised in the Commission's cross-appeal, the District Court is reversed on Claim 5(b) of the amended complaint and judgment is here entered for the cross-appellant; the cause is remanded to the trial court for further findings of fact and conclusions of law on Claim 5(d) of the amended complaint; and in all other things the District Court is affirmed.