**SEABOARD FIRE & MARINE INSUR-ANCE COMPANY, Appellant,**

v.

**Daniel GIBBS et al., Appellees.**

**No. 11433.**

United States Court of Appeals Fourth Circuit.

Argued Nov. 6, 1967.

Decided Feb. 28, 1968.

D. A. Brockinton, Jr., Charleston, S. C. (Brockinton & Brockinton, Charleston, S. C., on the brief) for appellant.

J. W. Cabaniss, Charleston, S. C. (Grimball & Cabaniss on the brief) for appellees.

Before HAYNSWORTH, Chief Judge, MARVIN JONES *, Senior Judge, and BUTZNER, Circuit Judge.

BUTZNER, Circuit Judge:

Seaboard Fire & Marine Insurance Company appeals a declaration that it is required to defend and respond in damages that its insured may suffer under provisions relating to a non-owned automobile found in a liability insurance policy issued Daniel Gibbs.[1] We believe the policy did not afford coverage, and reverse.

Gibbs, a farm hand driving his employer's truck, injured Thaddeus Brisbane. Seaboard insured Gibbs against liability arising out of use of his own pickup truck (not here involved) and some, but not all, non-owned automobiles. Seaboard refused to defend Brisbane's suit against Gibbs, and, invoking the diversity jurisdiction of the district court, brought this action for a declaratory judgment.[2]

## I.

On the threshold question, we agree with the district judge that the truck driven by Gibbs met the policy definition of an automobile—" * * * a four wheel land motor vehicle designed for use principally upon public roads * * *." Seaboard recognizes that the definition of an automobile includes a truck. This concession is inescapable because the policy was written to cover Gibbs' pickup truck. Gibbs' employer's truck is not within the definition, Seaboard claims, because it had six wheels— two on the front axle and four on the rear axle—instead of four wheels as specified in the policy definition. The literalness of this contention is attractive, but it is not in accord with well settled principles of South Carolina law. The terms of an insurance policy must be construed liberally in favor of the insured, and where the words of the policy are capable of two reasonable interpretations, the construction more favorable to the insured should be adopted. See Myers v. Calvert Fire Ins. Co., 246 S.C. 46, 142 S.E.2d 704, 705 (1965). The policy's definition of an automobile is designed to exclude vehicles such as motorcycles, golf carts, and heavy equipment with treads.[3] "Four wheels" is simply a generic term. The truck Gibbs drove could have been used with four wheels. The evidence discloses no significant change in function by the optional use of dual wheels on the rear axle.

## II.

Seaboard insured Gibbs when he was using a non-owned automobile within the scope of permission granted by its owners. The policy defines a non-owned automobile as " * * * an 'automobile not owned by or furnished or available for the regular use of * * * the named insured * * *'." When the

* Sitting by designation of the Chief Justice.

1. Seaboard Fire & Marine Ins. Co. v. Gibbs, 265 F.Supp. 623 (D.S.C.1967).

2. Brisbane's cause of action against Gibbs' employer is not an issue in this case. Previously Brisbane sued the employer and settled his case, reserving his rights against Gibbs.

3. In Brown v. Security Fire & Indem. Co., 244 F.Supp. 299, 302 (W.D.Va.1965), the court prefaced a thorough catalogue of definitions by observing, "Defining the word 'automobile' is not as simple as might appear on first blush * * *."

accident occurred, Gibbs, acting within the scope of the permission granted to him, was driving his employer's truck. The principal issue is whether the truck was "furnished or available for the regular use of" Gibbs. The district judge accurately summarized the evidence in his opinion, Seaboard Fire & Marine Ins. Co. v. Gibbs, 265 F.Supp. 623, 626 (D.S.C.1967):

"The named insured Daniel Gibbs was a forty-eight year old resident of Wadmalaw Island who worked for Messrs. A. W. Leland and K. W. Leland as a farmhand on their farm. He had worked for them for more than fifteen years, and he was in their employ at the time of the accident. For the last seven or eight years Gibbs had been driving trucks for the Lelands in connection with their agricultural operations. Gibbs was the only hand on the Leland farm that was qualified to drive the truck, and it was one of his duties to take the truck home at night and to return with it in the morning and to transport other farmhands to and from the Leland farms. The evidence shows that this involved no deviation from Gibbs' route to and from his place of employment. On some occasions Gibbs was driven home by his employers, and on those occasions the truck was not left with him. On occasions Gibbs was allowed to keep the truck at his home over the weekend.

"Of the three trucks operated by the Lelands, Gibbs was authorized from time to time to drive them all, but he regularly drove the Chevrolet which was involved in the accident. That truck was a two axle truck with tandem rear wheels. It could be operated with four wheels, but in the normal course of operation, and without exception so far as the record shows, it was operated with six wheels.

"The Leland farms employed only some five regular hands but at times— such as setting crops or gathering crops—other workers would be hired. It was customary for those workers who wanted the additional jobs at setting time or harvest time to wait on the road in the early morning for Gibbs to come by on his way to the farm. Gibbs would pick them up as a matter of course and take them with him to the Leland farm where they would be hired if needed by the Lelands. Gibbs worked regularly, and he was paid weekly for the days he had worked. If he worked less than a week, he was paid for only the number of days that he actually worked. The additional laborers employed at times were, presumably, employed by the day.

"During this cabbage setting season the Lelands employed a work force of approximately twenty-five to thirty workers. Only a portion of these would wait for the coming of the truck on the road for transportation to the farms. Whether all of these workers were employed every time they reported is not apparent from the record. Some regular workers were transported to work on the truck, depending on the fields to be worked that day, but the Lelands maintained that they did not consider anyone on the job until they had reported for work and had received assignments. The transportation of the laborers was admittedly to the benefit of the Lelands. The Lelands considered that the bringing of the farmhands to work was on their business. According to Aaron W. Leland the truck was not assigned to Gibbs. The principal duty of Gibbs, as his employer considered it, was to drive tractors for production and not, simply, to transport the workers. The transportation duties were on occasion taken by Mr. Aaron Leland himself."

The clause, "furnished for regular use," has been interpreted by the Supreme Court of South Carolina in two recent cases. Grantham v. United States Fidelity & Guar. Co., 245 S.C. 144, 139 S.E.2d 744 (1964), denied coverage to a deputy sheriff who used an automobile furnished by Beaufort County on a

full time basis in the performance of his duties and for personal purposes in the county. At the time of the accident, the officer had obtained special permission to drive the automobile on a personal trip outside the county. The court said (139 S.E.2d at 746):

"Insofar as it affects this case, the policy in question extends coverage to the insured if the injury is sustained while occupying an automobile other than the one defined in the policy, if the other automobile is not 'furnished for the regular use' of the insured or her husband. The purpose of such policy provisions is to afford coverage for the infrequent and casual use of vehicles other than the one described in the policy, but not to cover the insured with respect to his use of another vehicle which he frequently uses or has the opportunity to use. The intent is clear to protect the insurer from a situation whereby an insured could purchase a policy covering one automobile and be covered without qualification as to all automobiles available for his use." [4]

With immaterial interruptions, Gibbs used his employer's truck daily for seven years. Under the principles expressed in *Grantham*, his frequent use of the truck precludes coverage.

The other recent South Carolina case is Glisson v. State Farm Mut. Auto. Ins. Co., 246 S.C. 76, 142 S.E.2d 447 (1965), where the Supreme Court held that a jeep used by a person on temporary duty as officer of the day for the state National Guard was not furnished for regular use. The court pointed out (142 S.E.2d at 451):

"At the time of injury, Cheezem was temporarily engaged in the duty of Officer of the Day, thus performing a different duty than that normally required of him. The 'jeep' was not furnished for his regular use but,

rather, was assigned to him for use in performing the duty of Officer of the Day. There is no evidence in the record as to how frequently Cheezem used this 'jeep'; however, his use thereof was necessarily limited as he could only use this vehicle if it was properly dispatched to him."

The circumstances the court found lacking in *Glisson* are present in the case before us. Gibbs was performing the duty that was normally required of him, the truck was furnished for his regular use in performing the duty, and there is evidence in the record that he used the truck almost daily over a number of years.

The defendants rely in part upon State Farm Mut. Auto. Ins. Co. v. Smith, 206 Va. 280, 142 S.E.2d 562 (1965), in which the owner, before going to sea with the navy, left his automobile with his wife and gave his sister-in-law permission to drive it when needed. The court held the sister-in-law was afforded liability coverage under her own policy as the driver of a non-owned automobile.

For two reasons we believe *State Farm* is not applicable. The Supreme Court of Appeals of Virginia said (142 S.E. 2d at 567):

"We interpret the language 'furnished to the named insured for regular use' as referring to the furnishing for the insured's own purposes, and not the furnishing for the owner's or his family's purposes, with incidental permission for use by the insured for her purposes."

We believe the Supreme Court of South Carolina would not place this construction upon the policy issued to Gibbs. Neither *Grantham*, which held a similar clause unambiguous, nor *Glisson* turns upon such a limited interpretation.

Secondly, the Virginia court was impressed by the fact that the owner ap-

4. Accord: Pennsylvania Threshermen & Farmers Mut. Cas. Ins. Co. v. Robertson, 259 F.2d 389 (4th Cir. 1958), cert. den., 359 U.S. 950, 79 S.Ct. 735, 3 L.Ed.2d 683 (1959); Campbell v. Aetna Cas. & Sur. Co., 211 F.2d 732 (4th Cir. 1954); Commercial Ins. Co. of Newark, N.J. v. Gardner, 233 F.Supp. 884 (E.D.S.C.1964); Aler v. Travelers Indem. Co., 92 F.Supp. 620 (D.Md.1950).

parently did not give his sister-in-law blanket permission to use the car. The sister-in-law interpreted the terms of the permission as requiring further permission from the owner's wife each time she wanted to drive. Gibbs, however, was under no similar restriction. While he was employed, the truck was available for his regular use in the performance of his normal duties. His employer's unexercised right to withdraw permission did not make his regular use of the truck casual.

We conclude that the truck was furnished or available for Gibbs' regular use; it did not meet the policy definition of a non-owned automobile; consequently, Seaboard did not afford Gibbs coverage for the accident.

### III.

■ Assuming *arguendo* that the employer's truck meets the definition of a non-owned automobile, we believe coverage is excluded because of the work Gibbs was performing at the time of the accident. The policy contained these exclusions:

*"This policy does not apply:*
　　　* 　 * 　 *

"(a) to any automobile while used as a public or livery conveyance * * *;

"(b) to any automobile while used in the automobile business * * *;

"(c) to a non-owned automobile while used in any other business or occupation except a private passenger automobile [5] operated or occupied by the named insured or his private chauffeur or domestic servant, or a utility trailer used therewith or with an owned automobile;"

If Gibbs was engaged in his business or occupation as a farm hand, the exclu-

---

5. A private passenger automobile is defined in the policy to mean a private passenger or station wagon type automobile. For that reason there is no contention that the truck falls within the exception of subdivision (c) of the exclusions.

6. The court held that participation in National Guard activities other than on a

sion applies. The defendants urge that Gibbs simply was driving from his home to his place of employment when the accident occurred, and that neither he nor the men in the truck could be considered employed until they actually checked in at the farm.

In Glisson v. State Farm Mut. Auto. Ins. Co., 246 S.C. 76, 142 S.E.2d 447, 449 (1965), the Supreme Court of South Carolina held that the synonyms *business* and *occupation* are comprehensive terms that have very broad meaning and may be used in many different connotations. The court cited with approval definitions from Webster's International Dictionary (2d ed.):

*business*: "Constant employment; regular occupation; * * * any particular occupation or employment habitually engaged in, especially for livelihood or gain."

*occupation*: "That which occupies, or engages, the time and attention; the principal business of one's life; vocation; business." [6]

Application of these definitions makes clear that Gibbs was engaged in his business or occupation as a farm hand. When the accident occurred, Gibbs was transporting laborers for the benefit of his employer. This was part of his job.

Generally, with respect to workmen's compensation, an employee going to his place of work is not engaged in performing any service growing out of and incidental to his employment. South Carolina recognizes two exceptions, Gallman v. Springs Mills, 201 S.C. 257, 22 S.E.2d 715, 718 (1942):

"(1) Where in going to and returning from work the means of transportation is provided by the employer * * *;

---

full time basis is not a business or occupation encompassed by the policy provisions. Glisson v. State Farm. Mut. Auto. Ins. Co., 246 S.C. 76, 142 S.E.2d 447, 451 (1965); contra, Blackwell v. United States, 321 F.2d 96 (5th Cir. 1963); Voelker v. Travelers Indem. Co., 260 F. 2d 275 (7th Cir. 1958).

"(2) Where the employee, on his way to or from his work, is still charged with some duty or task in connection with his employment."

The analogy to the workmen's compensation law is not controlling, but it is instructive. Gibbs' transportation of the laborers in his employer's truck places him within both exceptions.

We conclude that even if the truck was a non-owned automobile within the policy definition, Gibbs' work at the time of the accident excluded coverage.

The judgment of the district court is vacated and this case is remanded for the entry of judgment for Seaboard Fire & Marine Insurance Company against the defendants and each of them.

Vacated and remanded.

MARVIN JONES, Senior Judge,* (dissenting in part):

I agree with the majority opinion that the policy should be construed to include the type of vehicle involved in the instant case. The policy was written specifically to cover a pickup truck. It would be a rather strained construction to hold that the placing of double, rather than single, wheels on the rear of two axles would take the coverage altogether away from the vehicle. Courts throughout the country, in interpreting automobile insurance policies, have construed the term "automobile" as broadly inclusive. In Continental Cas. Co. v. Buckeye Union Cas. Co., 143 N.E.2d 169, 75 Ohio Law Abst. 79, (Ohio C.P., Franklin County 1957), a rented U-Drive-It truck was held to be an automobile. In Washington Nat'l Ins. Co. v. Burke, 258 S.W. 2d 709, 38 A.L.R.2d 861, (Ky.Ct.App. 1953), it was stated the term "automobile" covers practically all kinds of self-propelled vehicles.

However, I cannot agree with the conclusions reached by the majority on the other two issues. The principal issue is whether the truck was "furnished for

the regular use of" Gibbs. I concede the closeness of this question, but a careful analysis of the facts in the light of previous decisions convinces me that the conclusions reached by the trial court are correct.

I do not interpret the principles announced in Grantham v. United States Fidelity & Guaranty Co., 245 S.C. 144, 139 S.E.2d 744 (1964), as being applicable to this case. In the *Grantham* case the car involved was furnished by the county to the deputy sheriff on a full-time basis, not only for his official use, but also for his personal use. He was in complete control of the car at all times. Clearly it was furnished for his regular use.

In the case at bar Gibbs was employed by the Lelands, who operated two farms on which were grown different kinds of produce, including cabbage. One of the farms was located on John's Island, the other on Wadmalaw Island. Ordinarily the Lelands would keep four or five hands, but during the planting and harvesting seasons they would frequently use twenty-five or thirty.

Gibbs was employed as a general farm helper. His principal duties were to drive tractors and trucks, but he did other work as well. R. 68A. It was necessary to transport the employees to work. The Lelands owned a pickup truck and two larger trucks. I quote from Mr. Leland's testimony:

Q. But he's principally a truck driver and tractor driver?

A. Yes, sir. Tractor driver and truck driver. These trucks are very seldom that we, other than getting to and from work, we're not using them continuously through the day. That's why I can't say he was principally a truck driver because he certainly drove a tractor and other farm work during the day. [R. 69A.]

The employees and Gibbs lived not very far from one of the farms. The Le-

---

* Sitting by designation of the Chief Justice.

lands would designate one of the trucks for Gibbs to use in transporting himself and other employees to and from their homes, which did not require Gibbs to go off the main road to his own home. The men would walk to the main road where they would be picked up. When more men were needed additional workers would come to the roadside and be picked up along the way. This was not done every day. The Lelands lived near one of the farms, and at times they would transport the workers and Gibbs to their homes. On such days Gibbs would not be assigned any truck. R. 66A. When Gibbs used a truck, he was permitted to keep it overnight which was more convenient. Gibbs reported each morning to the Leland's home place to get his instructions. R. 66A. Asked whether the truck was assigned to Gibbs, Leland replied:

No, sir. * * * None of my trucks are assigned to Dan [Gibbs]. He drives a truck that I designate for him to drive on any particular day.

Q. And on this particular date this truck was designated, you had designated * * *?

A. Yes, sir. [R. 69A.]

Different trucks were designated on different days. Usually the pickup truck was designated when only the four or five men were working, but in times when a greater number of workers were needed a larger truck was designated for Gibbs. And sometimes another truck would be used by one of the Lelands to haul some of the workers when a large number of workers were needed.

Gibbs worked for the Lelands many years, but was paid always at the end of each week for the number of days he had worked that particular week.

Nearly everything grown on a produce farm is perishable. The product must be gathered or harvested when it is ready. In the modern, practical world men do not walk distances to work. It was necessary to transport them several miles in this case.

It was most natural that the Lelands should permit Gibbs to keep one of the trucks overnight. Otherwise it would have been necessary for Gibbs to drive the men to their homes, then take the truck back to the Lelands' home, and then have the Lelands drive Gibbs to his home. This simply would not make sense. Permitting Gibbs to keep the truck overnight was a convenience to the Lelands and saved gasoline and time as well.

Q. [to Leland] Now, why did you let Daniel Gibbs have the truck over night?

A. Well because it was convenient. It saved me having to carry these people home, and gas, which it saved gas. [R. 64A.]

Clearly the facts do not fall within the ambit of the *Grantham* opinion. Certainly there was substantial evidence to support the trial court's findings of fact from which we quote:

* * * The transportation of the laborers was admittedly to the benefit of the Lelands. The Lelands considered that the bringing of the farmhands to work was on their business. According to Aaron W. Leland the truck was not assigned to Gibbs. The principal duty of Gibbs, as his employer considered it, was to drive tractors for production and not, simply, to transport the workers. The transportation duties were on occasion taken by Mr. Aaron Leland himself. [R. 8A.]

It also justifies the trial court's conclusions, from which we quote:

Although Gibbs' use of the truck may have occurred frequently in this instance the conclusion must be that the Lelands did not furnish or make available to the insured the truck for his regular use. To the contrary, the evidence leads to the conclusion that the Lelands directed the use of the truck on a day to day basis for Gibbs' transportation to work and for their business purposes only. Nowhere does

the record reflect that Gibbs ever had general and regular use of the truck. The same limitations on Gibbs' use of the truck obtained from day to day so long as the conditions of his employment remained the same. That this situation was a lasting one and that Gibbs frequently used the truck does not alter the arrangement between Gibbs and Leland. The use was casual from day to day and it was not for the regular use of Gibbs. Gibbs was not excluded by the "regular use" provision of the policy.

* * * The truck was within the definition of a nonowned automobile: it was not available for Gibbs' "regular use." It was therefore covered if it was not excluded. [R. 12A.]

The prevailing rule that a trial court's factfindings must be affirmed if there is substantial evidence to support them is based on reason and human experience. The trial judge sees the witnesses face to face and is more familiar with all the surrounding circumstances.

It is generally recognized in contract cases that any ambiguity or provision of doubtful meaning is construed against the party who wrote the contract.[1]

This frequently arises in insurance policies, which have been the basis of a great deal of litigation.[2] Insurance policies cover a wide field, including almost every form of individual and business activity.

In this particular case there are several exclusionary clauses that carry more than one exception to the paragraph which provides the exclusion. Some of these are rather difficult to interpret.[3] They were evidently written by a very clever lawyer, one who was at least not unfriendly to the Seaboard Fire & Marine Insurance Co. This is not a criticism; it is merely a comment. In law, as in life, these human tendencies sometimes appear.

The cases cited in the District Court's opinion are well analyzed and applied.

I would affirm.

1. Christmas v. Cooley, 158 Colo. 297, 406 P.2d 333 (1965); Aleksich v. Mutual Benefit Health & Accident Ass'n, 118 Mont. 223, 164 P.2d 372 (1945); Lilley-Ames Co. v. United States, 293 F.2d 630, 632, 154 Ct.Cl. 544, 548 (1961).

2. Baxley v. State Farm Mut. Auto. Liab. Ins. Co., 241 S.C. 332, 128 S.E.2d 165 (1962); United States Lines Co. v. Eastburn Marine Chem. Co., 221 F.Supp. 881 (S.D.N.Y.1963).

3. As an example of the complicated language I quote paragraph 6 of the policy:
"Exclusions
"*This policy does not apply:*
"Under the Liability, Medical Expense and Accidental Death Benefit Coverages,
"(a) to any automobile while used as a public or livery conveyance, but this exclusion does not apply with
respect to the occupancy of a non-owned automobile by the named insured or a relative, other than as an operator thereof;
"(b) to any automobile while used in the automobile business, but this exclusion does not apply to the use of an owned automobile (1) by the named insured or a relative, or (2) by any other insured in an automobile business in which the named insured has an interest as proprietor or partner;
"(c) to a non-owned automobile while used in any other business or occupation, except a private passenger automobile operated or occupied by the named insured or his private chauffeur or domestic servant, or a utility trailer used therewith or with an owned automobile;" [R. 73A–73B.]